862 P.2d 235

**STATE of Arizona, Appellee,**

v.

**Carl J. LANG, Sr., Appellant.**

**No. 1 CA–CR 91–0826.**

Court of Appeals of Arizona,
Division 1, Department A.

May 13, 1993.

Review Denied Nov. 30, 1993.

Grant Woods, Atty. Gen., by Paul J. McMurdie, Chief Counsel, Crim. Div., and Jon G. Anderson, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by Spencer D. Heffel, Deputy Public Defender, Phoenix, for appellant.

## OPINION

KLEINSCHMIDT, Judge.

The defendant, Carl J. Lang, Sr., appeals his conviction for first-degree murder. We reverse and remand for a new trial because improper contact between a key prosecution witness and members of the jury deprived the defendant of the right to trial by a fair and impartial jury. A detailed knowledge of the facts is important to a resolution of the several issues raised, and to an understanding of why the misconduct was prejudicial.

### FACTS

· The defendant and the victim were married in 1984. The victim grew dissatisfied with the relationship, and she began having romantic affairs with other men. In 1987, the defendant found a note in the victim's handwriting saying, "I live with one man and love another." The defendant confronted the victim with the note, but she brushed it off, and nothing immediate came of the episode.

The couple separated in October of 1988, although they continued to have an amicable, and sometimes even intimate, relationship over the next few months. In late December of 1988, the victim first told the defendant of her relationships with other men. Although the defendant knew a divorce was likely, he continued to see the victim.

On a day in late February 1989, the victim returned to Phoenix from an overnight business trip to Tucson. The victim's daughter from a previous marriage, who resided with the victim, arrived home that night at about 9:00 p.m. She found a note

from the victim stating that she had gone to a 7:00 p.m. meeting and would be home by 9:00 p.m. The daughter changed her clothes, wrote a note to the victim, and left the house by 9:30 p.m. When the daughter returned home around 2:20 a.m., the victim's car was in the garage. Everything else appeared normal, so the daughter went to bed.

The daughter awoke at about 7:00 a.m. the next morning. Believing that the victim was still asleep, she left another note and went to a business meeting. When she returned at approximately 9:00 a.m., she saw the defendant stepping out of the house into the garage. The defendant had earlier made plans with the daughter to work on the daughter's car that weekend, and the two began to do that. The daughter asked the defendant where her mother was, and he said he didn't know. When the defendant left to get a part for the car, the daughter went into the house and decided to check on the victim. She found the victim lying dead at the foot of the victim's bed. The bed sheets were covered with blood, and the room had been ransacked. The police arrived within minutes, and it was later determined that the victim had been killed sometime during the preceding night. A receipt from an automatic teller machine located near the victim's home showed that someone, presumably the victim, had withdrawn $20 from her account at 9:30 p.m. on the night she was murdered.

The investigation showed that the victim had been beaten with a blunt, threaded object, but the cause of death was strangulation by ligature. The investigation, which focused on the defendant, uncovered several circumstantial leads. There was no sign of forced entry, and only the victim's bedroom had been ransacked. There was a cigarette crushed into the bedroom carpet, which bore evidence derived from saliva indicating that the defendant, who was a smoker, could have been, but was not necessarily, the person who had smoked it.

The only things missing from the room were the victim's wedding rings. The defendant later produced these, claiming that he found them on a closet shelf in the victim's bedroom while helping to clean it. The daughter and a police detective had previously searched that shelf and found nothing.

The police recovered an anonymous letter which had been sent to the victim's employer by a person claiming to be the wife of one of the company's clients. The letter revealed that the victim was having an affair with the sender's husband and suggested that the victim be fired. The defendant's fingerprints were on the letter and the envelope in which it had been sent.

The defendant voluntarily submitted to three separate interviews with the police, the first two of which yielded nothing the police considered incriminating. The third interrogation lasted most of the day of Thursday, March 9, 1989, during which the defendant, according to the police, made several partial admissions to the crime. The interrogation was not tape-recorded, and the defendant denies that he made the statements the police characterize as admissions. The statements are described in more detail below.

The defendant was ultimately charged with the murder. His jury trial lasted six weeks. The state had many witnesses. Among them was the victim's daughter, who testified about the relationship between her mother and the defendant and about the events leading to her finding her mother's body. An expert witness testified concerning attempts to find fingerprints at the death scene and about the letter which the defendant had allegedly sent to the victim's employer.

The critical witnesses were the two detectives to whom the defendant had purportedly made incriminating statements. Detective Mark Jones had taken the lead in the third interrogation. During most of the questioning, Detective Don Byers was also present. According to the detectives, the defendant was questioned all day on March 9 until around 4:30 p.m., when he asked them whether he was going to be arrested that day. According to the defendant, he told the detectives that he did not

want to answer any more questions. At that time, the defendant became emotional, and according to both detectives, the defendant told them that he would leave for the weekend, talk to his sons and sister and get his affairs in order, and that he would return on Monday and would "solve the [victim's] homicide for you." Both detectives testified that the defendant said there was a lot of information they did not know, that things had started about two years earlier when he found the note his wife had written about living with one man and loving another, and that he would tell them everything they needed to know to resolve the case. The defendant had a different version of what he said. According to him, he simply told the detectives that if they would just let him leave, he would come back whenever they wanted and answer any questions they had.

At this point, Detective Jones left the room to seek an opinion from the county attorney as to whether there was enough evidence to arrest the defendant. The defendant had given the detectives the keys to his apartment and his car so they could search them. While he understood that he was free to leave, he decided to go with Detective Byers to get something to eat. After eating, Byers and the defendant again met with Detective Jones. According to Jones' testimony at trial, he asked the defendant what he did with the weapon he used to kill the victim, and the defendant replied that he could not tell them exactly but that it would be found in a field, and he would tell them more on Monday. Again, the defendant had a different version of what he said. He testified that when Jones asked him where they might be able to find the pipe, he, the defendant, became angry that they were continuing to question him and facetiously said that maybe they could find it in a field somewhere.

Following this, the detectives and the defendant went to the defendant's apartment so the detectives could search it. Detective Jones testified that the defendant told them that nothing they were looking for would be found in the apartment except for the rings, which the defendant said he was keeping until the victim's children decided what to do with them.

According to Jones, when Jones asked the defendant which clothes he had worn on the night the victim was murdered, the defendant replied that they had been discarded. When asked why, the defendant said, "It seemed like the right thing to do." The defendant, at trial, testified that he told Jones that since relatives were staying with him at the time of the funeral, he discarded a lot of clothes to make room in a closet and that the clothes he wore on the night of the murder may have been among these. The defense was also able to show that Detective Jones had described his question about the clothes in different ways on different occasions.

Detective Jones also testified that he asked the defendant which vehicle he drove to the victim's house the night of the murder, and the defendant replied that he had driven his truck. The defendant's version of this question was that he was simply asked what vehicle he was driving on the night his wife was killed. He insisted that he had always denied that he had been at the victim's house on the night of the murder.

At trial, the defense questioned the sufficiency of the state's evidence. Much of the defense effort was directed at casting doubt on the detectives' testimony about the statements the defendant had allegedly made to them. The state called Detective Byers, who was designated as the state's investigating officer and who remained at counsel table during the trial as a witness. His testimony was consistent with Detective Jones' version of the defendant's statement about solving the case for them, about telling the police everything they needed to know, about telling them that there was a lot they did not know, and the defendant's having said that everything had started when he found the letter. The testimony of Byers and Jones was also in agreement concerning what the defendant said about the whereabouts of the pipe. In argument for the state, the prosecutor twice pointed out that Detective Byers was

present during the third interrogation and that Byers' version of events backed up Jones' testimony.

## IMPROPER CONTACT BETWEEN DETECTIVE BYERS AND THE JURY

The defendant is entitled to a new trial because Detective Byers fraternized with members of the jury during the trial. The record discloses the following.

Near the end of the trial, a court reporter, who was working the trial for that day only, overheard the bailiff talking with the jurors during a break. During another break, the court reporter overheard Detective Byers talking with some of the jurors. The court reporter, who thought something was amiss, mentioned what he had observed to an acquaintance in the county attorney's office. That person informed the assistant county attorney prosecuting the case, who relayed the information to the trial judge. The trial judge received this information after the jury began deliberations but before they reached a verdict.

The trial judge questioned the court reporter in the courtroom with representatives of all parties present. The court reporter said that the bailiff, who had been gone for several days, had asked the jurors what had been happening in the trial in his absence. The bailiff appeared to the court reporter to react with disbelief as to what the jurors were telling him about the testimony. The court reporter also said that Detective Byers told several jurors that defense counsel's examination of a particular witness had been "worthless."

The trial judge then called Detective Byers on the telephone. Byers denied conversing with the jury about the trial and described his contact with them as follows:

Good morning, things of that nature. They will ask me, "good morning, Detective. Good morning. How are you doing," that type of thing. That's it. That's the extent of any conversation I've ever had ... But again I've never had a conversation with any jury member, including those people, about this trial.

Detective Byers said that his only other contacts with jurors outside the courtroom occurred when the court clerk asked if he would give a juror a ride home—he said that he refused because it would have been inappropriate—and when he returned a checkbook which a juror had left in the bathroom.

The trial judge next questioned the bailiff under oath. The bailiff denied asking the jury anything of substance about the trial or how it was proceeding. He did say that he overheard Detective Byers telling a story to some of the jurors.

The trial judge brought the court reporter back to the stand, and allowed the defense attorney to question him. The court reporter repeated what he had said about the bailiff being in the jury room asking the jurors what he had missed while he was away. When asked what he observed about Detective Byers' contacts with the jury, the court reporter amended his version of events somewhat. His testimony was as follows:

[Defense Lawyer]: Then there was another event which occurred ... with the police officer?

[Court Reporter]: The other—again, my memory is this was at the break, because there were jurors at the table out in the hallway on the 11th floor smoking.

[Defense Lawyer]: What is called the judge's hallway?

[Court Reporter]: Judge's hallway. They were smoking. I was again in the same area, down the hall a little further. Byers came through the double doors by the elevators, was walking apparently down the hallway somewhere.

Anyway, intended to go past them but one of the jurors spoke to him and he stopped for a second, and again this all was 30 seconds or less and a comment again was made to the effect of, "How long is this going on?" or words similar in import anyway to that by the juror.

And Byers simply stopped, said something to the effect, "I don't know," kind of shrugged his shoulders and the juror said something like "Are there anymore witnesses?" And I don't even have a recollection frankly if Byers said anything or not. I turned around again at that point and just—I mean, I just didn't want to believe anything like that.

But let me say this that the jurors were very, just from the one day I was there, very lax about who they spoke in front of. They were out in the hall constantly. Half of them weren't wearing juror badges certainly. Other than people in the trial knowing they were jurors, you wouldn't have known that. It just seemed like a very loose group, and they certainly didn't make any pretext about talking about the case and expressing their feelings about what was going on, no matter who was around it seemed to me.

[Defense Lawyer]: So there was discussion—well, let me ask this. In this, the little statement that you've given, one of the questions the court asked you today was if you recognized Byers as the person who was there that day?

[Court Reporter]: Yes

. . . .

[Defense Lawyer]: The question was you recognize Byers, the person, you said yes, and he was commenting with the jurors about [the defense lawyer's] examination of a particular witness and making some comments about—just along those lines about how long the examination was taking and about how worthless it was, et cetera, and those two instances. So there was some conversation you heard along those lines?

[Court Reporter]: Frankly the worthless I'm surprised I said that, because the worthless part, just kind of shrugging his shoulders and shaking his head. I don't think he made a comment, "This examination is stupid" or something like that. No, I don't think he said anything like that. I think much more closely what he said is what I said just a few

minutes ago here, that it was—it was just a 30 second or less comment about—

[Defense Lawyer]: Did you hear the name [of the defense lawyer]? You and I have known each other a long time, so you know that name.

[Court Reporter]: No.

[Defense Lawyer]: You are assuming that it was about [the defense lawyer's] examination?

[Court Reporter]: Well, that's what was going on at the time.

The court reporter's testimony can be taken to mean that the detective's body language suggested that the testimony was worthless, but the ambiguity on this point was never dispelled. Later, during argument on the motion for mistrial, the prosecutor contended that this exchange could not have prejudiced the defendant because any disparagement of testimony by the detective must have pertained to the prosecutor's examination of the defendant since he had been cross-examining the defendant for most of the day. The clerk's records of the sequence of witnesses strongly suggests that the court reporter was correct and the prosecutor was incorrect on this point.

While the defendant has not pursued the matter regarding the bailiff's conduct, we note that if the bailiff did ask the jury about what had occurred at trial in his absence, such was improper. The trial judge, at this point, made no finding of fact as to what the bailiff did or did not do, but later found that the bailiff's actions did not influence the jury. Assuming the court reporter's description of the bailiff's conduct is correct, and the trial judge in ruling on a later motion for new trial seemed to accept the court reporter's version, such conduct would add weight to our conclusion about the prejudice that ensued from Detective Byers' contact with the jurors.

The defendant made a motion for a mistrial based on Detective Byers' conduct. The trial judge denied the motion, finding that Detective Byers' conduct as reported had not prejudiced the defendant. After the jury returned its verdict, the defendant

renewed his motion for a mistrial. The trial court put Detective Byers on the stand and the detective swore under oath that the prior statements concerning his contact with the jury which he had related to the judge over the telephone were the truth.

The trial judge then brought the jurors in one at a time and personally questioned them under oath. He allowed counsel to question them, although he restricted the questions they could ask. The jurors' testimony showed that Detective Byers had varying contact with six of them. The record is not clear as to the exact number and sequence of contacts, or exactly who was present on each occasion. According to the jurors, however, Detective Byers kidded around with them, telling them stories about past crimes and stupid things criminals had done, including a story about a bank robber who had left his driver's license at the bank. On another occasion, Detective Byers began telling a member of the court's staff a story about a police officer who had shot himself while under the influence of drugs or alcohol. This occurred in the presence of some members of the jury, who joined in on the conversation. One juror testified that she enjoyed these stories and that they made her laugh. On one of these occasions, a juror asked Detective Byers how he liked his job. Byers said that it was okay but that the Mesa Police Department was undergoing many needed changes. On another occasion, a juror also asked the detective how many witnesses were left and how long the trial would last. The detective replied that there were only five or six more witnesses and that the trial would be wrapped up soon. Detective Byers asked for some candy from one juror on at least one, and possibly more than one, occasion, and another juror told Detective Byers that they could use a drink, and the detective responded with a laugh. These contacts centered around four or five of the jurors. A different juror related that Detective Byers had returned his checkbook and later joked with him about it. Finally, still another juror stated that he had a casual conversation with Detective Byers about the trial being delayed.

Neither the judge nor the attorneys questioned the jurors about whether the jurors had been influenced by their contact with Detective Byers. Before the jury was brought in and questioned, the prosecutor objected to any questions being asked about whether the jurors were influenced "by a particular set of circumstances." The judge and the attorneys discussed Rule 24.1(d) of the Arizona Rules of Criminal Procedure, which precludes testimony from jurors regarding their subjective motives or mental processes which led to a particular verdict. The judge stressed that he did not want the jurors put through any "great interrogation" and that it was his intent to allow the attorneys to ask the jurors "what happened last Thursday," referring to the day the court reporter observed what he thought was a problem.

As it developed, the questions asked by counsel for the defense elicited answers about contacts that occurred at times other than the Thursday to which the judge had referred. The state objected to this, and the objection was sustained. Although the defendant does not claim that this curtailment of his inquiry was reversible error, we think that once the problems of ongoing contact between the witness and the jurors surfaced, the defendant should have been allowed to explore the subject completely. Given the fact that the record supports a reversal, the restrictions placed on the defendant were harmless errors. The defendant never sought to question the jurors about whether their verdict was influenced by their contact with the detective, so we need not address whether such questions are permissible in a case such as this.

The minute entry for the day the jurors were questioned reflects that the judge found that there was no inappropriate behavior between the jurors and the detective, but the judge did not rule on the motion for mistrial at that time. About a week later, the defense filed a written memorandum in support of the motion for a mistrial, and the state responded. These memoranda apparently changed the judge's mind about the nature of contact between

the detective and the jurors because when the judge denied the motion for a new trial just before sentencing, he clearly realized that the conduct was improper. The judge found that Detective Byers should be reprimanded for "the activity that took place or is alleged to have taken place." The judge did not attach much weight to the court reporter's testimony because he thought that it contained "at least half a dozen" contradictions. The judge did not find that the jurors' testimony was not true, but said that he had thought about the jurors' testimony and decided that the contacts that the bailiff and the detective had with the jurors had not influenced the jury's decision.

With the exception of the court reporter's retraction of the statement about having heard the detective describe testimony as worthless, we can find no inconsistencies or contradictions in what the reporter said. In any event, the essence of the judge's finding is that the jurors' versions of their contacts with the detective were correct. The state does not contend otherwise, and, indeed, this record provides very strong support for that conclusion. Notwithstanding the type and degree of improper contact revealed, the judge concluded that these irregularities had not affected the verdict.

■ The law is very clear. Jurors and witnesses should avoid any contact or conversation during trial. *State v. Apodaca,* 166 Ariz. 274, 801 P.2d 1177 (App.1990); *State v. Garcia,* 141 Ariz. 580, 688 P.2d 206 (App.1984). Such improper contact is not grounds for a mistrial unless the defense establishes that the misconduct was prejudicial or that prejudice can be fairly presumed. *Apodaca,* 166 Ariz. at 276, 801 P.2d at 1179; *see also State v. Vasquez,* 130 Ariz. 103, 107, 634 P.2d 391, 395 (1981); *Marino v. Vasquez,* 812 F.2d 499 (9th Cir. 1987) (prejudice from juror misconduct is presumed from the facts when there is a reasonable possibility that the misconduct could have affected the verdict). A trial judge's decision to grant or deny a new trial because of an irregularity involving jury conduct will not be overturned absent a clear abuse of discretion. *Apodaca,* 166 Ariz. at 276–77, 801 P.2d at 1179–80. Here, we conclude that the trial judge did clearly abuse his discretion in denying the motion for new trial.

■ Improper contact between witnesses for the state and members of the jury denies the defendant the right to trial by a fair and impartial jury. *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). Courts in a number of states have reversed convictions and remanded for a new trial for conduct remarkably similar to what Detective Byers did in this case. Before we discuss those cases, it should be pointed out that most of them were decided in jurisdictions where the rule is that impermissible contact between a witness and jurors creates a rebuttable presumption that the defendant has suffered prejudice. Under the facts of this case, we see very little difference between that test and the Arizona test, i.e., that prejudice can be fairly presumed from the particular facts of the case.

The case of *State v. Pike,* 712 P.2d 277 (Utah 1985), contains a good explanation of why such fraternization between witnesses and jurors is harmful. In *Pike,* a police officer, who was a key witness in the case, mingled and conversed with jurors during a recess. There was only a partial record of what they talked about, and the conversation had nothing to do with the merits of the trial. In reversing and remanding for a new trial, the Supreme Court of Utah pointed out that any but unintended and incidental contact may breed familiarity which can affect a juror's judgment as to credibility, that this may be true even though the juror does not consciously recognize its effect, that such fraternization has a deleterious effect on the judicial process because it creates an appearance of impropriety, and that it creates a legitimate doubt in the mind of the defendant and his friends as to whether or not he had a fair trial. *Id.* at 279–80; *see also State v. Erickson,* 749 P.2d 620 (Utah 1987) (five-minute general conversation between a detective witness and a juror concerning the

detective's job and family matters warranted reversal).

In *Woods v. State*, 233 Ind. 320, 119 N.E.2d 558 (1954), police officers who were witnesses for the state visited with members of the jury in the jury room during recesses but did not discuss anything about the case being tried. In reversing, the Supreme Court of Indiana said:

> If the appellant during intermissions had been permitted to go in the jury room and visit and fraternize with members of the jury, the State could properly have moved to declare a mistrial. The jury should determine the credibility of witnesses and the weight to be given their testimony from the evidence given upon the trial, and it would be all too easy for the jury unconsciously to be influenced as to these matters by a friendly association with the witnesses for the state.

*Id.* 119 N.E.2d at 560; *see also Kelley v. State*, 555 N.E.2d 140 (Ind.1990) (prejudice found when state's only witnesses went to lunch with jurors although the case was not discussed, and jurors said contact did not influence their verdict); *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979) (conviction reversed because sheriff who was a witness in the case conversed with jurors on three occasions concerning the sheriff's experiences); *State v. Bailey*, 307 N.C. 110, 296 S.E.2d 287 (1982) (prejudice to defendant found because sheriff who was a witness transported jurors to dinner, presumably improving his image and strengthening his credibility with them); *Romo v. State*, 500 P.2d 678 (Wyo.1972) (reversed because police officers who were witnesses ate lunch with jurors and talked about hunting and fishing).

■ We are aware of cases which hold, under a variety of circumstances, that contact between a witness and jurors did not warrant reversal. In many of them, the courts applied a test that required the defendant to show *actual* prejudice, and there was no discussion in those cases of anything like the Arizona rule that the defendant has carried his burden if prejudice can be fairly presumed from the facts. *See State v. Rhodes*, 219 Kan. 281, 546 P.2d 1396 (1976); *State v. Dotson*, 260 La. 471, 256 So.2d 594 (1971), *cert. denied*, 409 U.S. 913, 93 S.Ct. 242, 34 L.Ed.2d 173 (1972); *State v. Eaton*, 504 S.W.2d 12 (Mo. 1973); *State v. Holland*, 178 W.Va. 744, 364 S.E.2d 535 (1987). In several cases we have found in which courts refused to reverse, the contact between the witness and the jurors was less significant than occurred in the case before us. *See People v. Ryner*, 164 Cal.App.3d 1075, 211 Cal.Rptr. 140 (1 Dist.1985) (brief contact between officer who was not a key witness and jurors where state had a strong case); *State v. Allard*, 557 A.2d 960 (Me.1989) (witness and juror related by marriage discussed juror's probable release from panel); *Nyberg v. State*, 75 Wis.2d 400, 249 N.W.2d 524 (1977) (witness told juror he went to school with juror's son and a brief conversation about armed forces pay ensued which was cut off by district attorney who told witness not to talk to juror). We disagree with the one case we have found in which the contact was significant but the court failed to reverse. *See Smith v. State*, 173 Ga.App. 889, 328 S.E.2d 553 (1985) (Beasley, J., dissenting) (juror and witness have lunch together).

■ Detective Byers' conduct was a serious incursion on the integrity of the jury system. From our review of the record, we have no hesitation in saying that it is entirely possible that his behavior affected the verdict. It is not clear whether the trial judge was aware that a defendant has carried his burden of proving that a new trial is warranted if prejudice can be fairly presumed from the facts. In any event, the judge's ruling gives too little weight to the possibility that fraternization can have a definite but subtle effect on the assessment of credibility. While the evidence does not disclose—with the possible exception of the occasion when he reacted to a juror's questions with body language—that Byers discussed the evidence with the jury, it is obvious that he fraternized with the jurors and ingratiated himself with them. It is equally obvious that Byers' corroboration of Detective Jones' hotly-contested version of what the defendant told the police

was highly significant. The case against the defendant was not overwhelming, and the defendant's statements as related by Detective Jones were the most damning evidence the state produced. Even if the jurors had been questioned in depth about the effect of the contact between them and the detective and had denied that their verdict had been influenced thereby, it would be almost impossible in this case to discern with any degree of confidence whether the defendant had really received a fair trial. It was an abuse of discretion to find otherwise.

## ADMISSION OF THE DEFENDANT'S STATEMENTS

The defendant next claims that the trial court allowed the introduction of statements obtained in violation of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Late in the third interview, according to the defendant, he told the detectives that he did not want to answer any more questions, but that he would return later if they wanted. The defendant filed a motion to suppress any statements made after that time, claiming that he had invoked his right to remain silent and that the police had continued to interrogate him anyway. An evidentiary hearing was held. A judge, not the judge who ultimately presided at trial, denied the motion. She ruled that the defendant's statements were voluntary and could be admitted against him but that the words the defendant used when he told the police he did not want to talk to them further could not be admitted.

The prosecutor, without alluding to the defendant's having invoked his right to remain silent, commented in his opening statement about things the defendant said after invoking his right. The defendant moved for a mistrial, arguing that the first judge's ruling was unclear and could be read as a suppression of all statements made subsequent to the defendant's invocation of his right to remain silent. The trial judge denied the motion. The defendant now claims that the trial judge erred by impermissibly granting a horizontal appeal

of the first judge's decision by allowing these statements in evidence.

 Police may continue to question suspects who are not in custody, even though they invoke their right to remain silent, as long as the responses are voluntary and the person's will has not been overborne. *State v. Stanley,* 167 Ariz. 519, 809 P.2d 944, *cert. denied,* —— U.S. ——, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991). The judge who ruled on the motion to suppress found that the defendant was not in custody during the interrogation, that the defendant's will had not been overborne and that his answers were voluntary. The judge's ruling was straightforward. While the state could not refer to the defendant's words used to invoke his right to remain silent, any subsequent statements were voluntary in nature and therefore admissible. The trial judge's later ruling was consistent, not at odds, with this earlier ruling. The defendant's position on this issue is without merit.

## FAILURE TO PRESERVE EVIDENCE

The defendant claims that he was entitled to an instruction based on *State v. Willits,* 96 Ariz. 184, 393 P.2d 274 (1964), because the police destroyed evidence that was, or might have been, favorable to him. A defendant is entitled to a *Willits* instruction if (1) the state failed to preserve accessible material evidence that might have been exculpatory, and (2) there was resulting prejudice. *State v. Hansen,* 156 Ariz. 291, 295, 751 P.2d 951, 955 (1988). The trial judge's decision on whether to give the instruction will be upheld absent an abuse of discretion. *Id.*

The defendant's argument relates to the letter which the state said the defendant sent to the victim's employer several months before the murder informing the employer that the victim was having an affair and suggesting that she be fired. The police processed the letter and the envelope for fingerprints and found the defendant's prints on them. This processing rendered it impossible to test these items to determine whether the defendant's saliva was on the gummed portion of the envelope or on the postage stamp. There was evidence that the envelope could have

been processed for saliva first, and then fingerprinted. The defendant argues that if his saliva was not on the envelope, someone else must have sent the letter. He requested a *Willits* instruction, and this was denied.

The state argues that *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), did away with the need to give a *Willits* instruction when evidence has been lost or destroyed. The state reads *Youngblood* too broadly. *Youngblood* narrowly held that when the exculpatory value of lost or destroyed evidence is uncertain, the defendant must show that the police acted in bad faith when they disposed of the evidence before due process mandates a dismissal of the case. *Id.* at 58, 109 S.Ct. at 337. More recently, our own supreme court has acknowledged the continuing vitality of *Willits*. *See State v. Youngblood*, 173 Ariz. 502, 844 P.2d 1152 (1993); *State v. Hill*, 174 Ariz. 313, 848 P.2d 1375 (1993); *State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

The state destroyed the biological evidence on the envelope by doing the fingerprint analysis on it. The biological evidence was accessible. The biological evidence, like the fingerprints, might have had some bearing on who sent the letter. The evidence might have been exculpatory because positive proof that someone other than the defendant sealed the envelope and affixed the stamp suggests that the defendant did not write the letter.

There are, however, countervailing considerations to the giving of the instruction. First, there was evidence that the chances of obtaining biological evidence from the envelope were reduced because it had remained unpreserved for a long period of time before the police even learned of its existence. Second, the envelope may not have contained any biological evidence because an envelope can be sealed and a stamp affixed without licking it. Third, as the trial judge observed, the letter was not very important evidence.

We might agree with the trial judge that the letter's importance to the ultimate issue

in the case was so minor that the loss of any potentially exculpatory evidence concerning it was not prejudicial to the defendant. *See State v. Torres*, 162 Ariz. 70, 781 P.2d 47 (App.1989). The "fact" that the defendant sent the letter does little to prove he was the murderer. The "fact" that the defendant did not send the letter does little to prove that he was not the murderer. A review of the record persuades us, however, that the requested instruction should have been given. To begin with, the letter had sufficient relevance to be admissible in evidence. The state's theory of the case was that the victim was the most important thing in the defendant's life, and he was not going to let her walk out on him. The letter bolstered the state's theory because it showed the lengths to which he would go to prevent their relationship from coming to an end. If the state was allowed to prove that the defendant wrote the letter, the defendant had every right to prove that he did not.

Perhaps what is most important, however, is that the prosecutor *acted* as if the letter was important. He used a blowup of it during his final argument, and he spent considerable time and attention demonstrating how he had proved that the defendant actually wrote the letter. Defense counsel also addressed the letter at length in his final argument, and the prosecutor came back to the subject in rebuttal argument. While, as we have already observed, the letter was actually of little significance, given the way the case was presented the jury might have thought it was important. While we might not reverse if the failure to give a *Willits* instruction was the only error in the case, since the case must be retried anyway, a *Willits* instruction should be given if the state again seeks to admit the letter in evidence.

■ The defendant contends, for the first time on appeal, that the case should have been dismissed because the police destroyed his ability to test the envelope. Even if the matter were properly raised, the defendant is not entitled to a dismissal since there is no finding that the evidence was destroyed in bad faith. *See Arizona v. Youngblood*, 488 U.S. at 58, 109 S.Ct. at

**486**

337; *State v. Youngblood,* 173 Ariz. at 508, 844 P.2d at 1158.

### ACCOMPLICE LIABILITY INSTRUCTION

The defendant's final claim of error is that the trial judge improperly instructed the jury on accomplice liability. An accomplice instruction should be given only if reasonably supported by the evidence. *State v. Marlow,* 163 Ariz. 65, 69, 786 P.2d 395, 399 (1989) (citing *State v. LaGrand,* 152 Ariz. 483, 733 P.2d 1066, *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987)).

There was some slight suggestion that more than one person was at the victim's house the night of the murder. The crushed cigarette found in the bedroom had some biological evidence derived from saliva on it. An expert testified that it was also *possible* that two people smoked the cigarette. The evidence was conclusive enough to exclude the victim from having smoked it, but inconclusive as to whether the defendant might have been the smoker or one of the smokers. A neighbor also testified that he saw two vehicles parked outside the victim's house around 1:00 a.m. on the night of the murder.

■ The defense used this evidence to hint that it was possible that the victim had been killed by her son and one of his friends. While the state never seriously argued that the defendant and an accomplice killed the victim, since the defendant posited that two people might have been involved, the state was entitled to an instruction that told the jury that the defendant could be guilty even though another person had participated in the killing.

### CONCLUSION

Because of the misconduct of the state's witness, the judgment of guilt is reversed, and this case is remanded for a new trial.

EHRLICH, P.J., and CONTRERAS, J., concur.