NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

ALFREDO GERARDO BLANCO, *Appellant*.

No. 1 CA-CR 19-0122
FILED 9-10-2020

Appeal from the Superior Court in Mohave County
No. S8015CR201700078
The Honorable Richard D. Lambert, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

Mohave County Legal Advocate's Office, Kingman
By Jill L. Evans
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Chief Judge Peter B. Swann joined.

---

**W I N T H R O P**, Judge:

**¶1**		Alfredo Gerardo Blanco ("Blanco") was found guilty of first-degree murder, concealment of a dead body, and tampering with physical evidence.  He appeals the trial court's denial of his motion to suppress statements made during a non-custodial interrogation after he invoked his right to remain silent and requested counsel.  Blanco also appeals his conviction for premeditated first-degree murder, arguing there was insufficient evidence of premeditation to support the verdict.  In addition, he contends the court committed reversible error by failing to allow certain jury instructions.  For the following reasons, we affirm.

**FACTS[1] AND PROCEDURAL HISTORY**

**¶2**		In June 2015, the victim, S.C., was visiting Kingman and staying with friends.  Blanco worked as a handyman in Kingman and helped manage multiple real estate properties owned by S.C.  In exchange for managing the properties and collecting rent for S.C., Blanco received ten percent of the rent collected.

**¶3**		Blanco had been hired to help refurbish an old, uninhabited home on Wilson Ranch Road (the "ranch house"), located around twenty miles outside of Kingman.  S.C. did not own the house or have any connection to it.

**¶4**		Early in the day on June 16, 2015, Blanco and S.C. met up to exchange rent money Blanco had collected.  The pair met at a house on Club Avenue (the "Club house") that Blanco was in the process of remodeling, before getting lunch at In-N-Out Burger and dropping off food to Blanco's family.

---

[1]		"We view the evidence in the light most favorable to sustaining the verdicts and resolve all inferences against appellant."  *See State v. Fontes*, 195 Ariz. 229, 230, ¶ 2 (App. 1998).

¶5  The two eventually proceeded to the ranch house. There, Blanco shot S.C. with a 12-gauge shotgun, loaded with bird shot or snake shot. Blanco did not call 911.

¶6  Later in the afternoon, Blanco met up with William Sanders at the Club house. Blanco and Sanders were friends and work associates, and had planned to go to the ranch house that day to tow a trailer using Sanders' truck. The two drove separately to the ranch house and upon Sanders arriving, Blanco told Sanders that he wanted to show Sanders something inside the ranch house. Blanco led Sanders into the house and to the body of S.C., which was seated on the ground against a door frame. Blanco told Sanders that he had shot S.C. by accident when trying to shoot a rattlesnake in the wall.

¶7  Sanders moved toward the body to check for a pulse and Blanco said, "Don't bother, he's gone." Sanders saw that the side of S.C.'s body had been completely blown away by the gunshot and told Blanco that they needed to call the police. Blanco refused and said he had already dug a hole in the backyard for the body. Sanders again asked to call the police, but Blanco again refused and asked Sanders if he had ever lost anyone close to him.[2]

¶8  Blanco then abruptly left the room and came back a few minutes later with a tarp. The two wrapped S.C.'s body in the tarp, carried it to the back door, and loaded it into the front bucket of a backhoe. Blanco drove the backhoe to a hole near a shed in the backyard and rolled the body out of the tarp and into the hole. Blanco used the backhoe to fill the hole with dirt and level off the ground. After the body had been buried, Blanco and Sanders drove separately back to Kingman.

¶9  Early the following morning, Blanco sold two rings to a jewelry store owned by his ex-son-in-law, Myron Storing. Blanco told Storing that he had found the rings in a house he was remodeling.

¶10  Later that day, Blanco called the friend who S.C. had been staying with and asked about S.C.'s whereabouts. The friend reported that S.C. had not come home for dinner on the 16th nor contacted him the next morning. Blanco and the friend drove around together to look for S.C. They found S.C.'s motorcycle at the Club house and then searched for S.C.

---

[2]  Sanders testified that he interpreted this question as a threat and thought he or his family would be in danger if he told anyone what had happened.

at a property S.C. had been trying to sell. In the evening, the friend reported S.C. as missing to the Kingman police.

¶11        A search and rescue operation was undertaken, with a focus on the areas where S.C. owned real estate. Blanco told the search and rescue supervisor that he had last seen S.C. at In-N-Out Burger around 11:30 A.M. on June 16. S.C.'s brother traveled to Kingman to assist in the search and stayed with Blanco while in Kingman. At one point, Blanco told S.C.'s brother that he believed the family of S.C.'s fiancée, who was from Mexico, may have targeted S.C. because he was white. Blanco also told the brother that S.C. had represented that if anything ever happened to him, he wanted Blanco to have the "property on the hill," a desirable piece of real estate.

¶12        Blanco was interviewed as a witness by police. Blanco told police that he had last seen S.C. at the Club house before leaving to finish a painting job at a nearby subdivision. Blanco stated he later began driving toward Wikieup, but turned back when he remembered he was supposed to meet up with S.C. again in the evening. Blanco claimed he called S.C. multiple times that evening but was never able to get ahold of him.

¶13        A few days after learning that S.C. was missing, Storing, the jewelry store owner, looked at pictures of S.C. on Facebook and noticed that S.C. was wearing the rings that Blanco had sold Storing on June 17. Storing placed the rings in a plastic bag, told a member of the search and rescue team about the rings, and eventually handed over the rings to Kingman police.

¶14        Around the same time, Police obtained possession of a rental car that Blanco had been using on June 16. Police conducted forensic testing on the vehicle, including testing a buildup of red soil on the undercarriage of the car. The soil type did not match any road or location Blanco professed to have traveled on June 16, but did match several other locations around Kingman, including the area around the ranch house.

¶15        A few weeks later, law enforcement mapped location data for S.C.'s and Blanco's cell phones. The data showed both phones leaving the area around In-N-Out Burger in Kingman, arriving at the ranch house, and coming back to Kingman around the same time.

¶16        Near the end of 2016, the FBI joined forces with Kingman police in investigating S.C.'s disappearance. In the months following S.C.'s disappearance, Sanders had been interviewed on several occasions, but had never disclosed any information related to S.C.'s disappearance. But in

January 2017, several officers interviewed Sanders again and Sanders finally admitted that he knew where S.C.'s body was buried.

¶17            Sanders led agents to the ranch house and explained how the events of June 16, 2015, had transpired.  There, law enforcement recovered a body, which was confirmed to be S.C. through dental records.  A medical examiner established that S.C. had died after bleeding out from a close-range shotgun shot of bird pellet.  Soon after, officers found records that Blanco had sold a 12-gauge shotgun to a local pawn shop in October 2015 and an officer recovered the weapon.

¶18            On January 10, 2017, law enforcement interviewed Blanco at a convalescent center in Surprise, Arizona, where Blanco was living at the time.  Blanco was coherent and using a motorized wheelchair.  During the interview, Blanco confirmed he had been working on the ranch house, but denied that he was there on June 16, 2015, and denied ever being there with S.C.  Even after being confronted with the phone records placing him and S.C. at the ranch house and after being offered the opportunity to explain any accident, Blanco still denied having been at the ranch house with S.C.  Blanco terminated the interview and left the room when an officer showed him a picture of S.C.'s remains.

¶19            A grand jury indicted Blanco for one count of first-degree murder (Count 1), one count of concealment of a dead body (Count 2), and one count of tampering with physical evidence (Count 3).  Blanco was found guilty of all counts.  The court sentenced him to natural life in prison for Count 1, the presumptive term of one and a half years for Count 2, and the presumptive term of one year for Count 3, with Counts 2 and 3 running concurrent to each other, but consecutively to Count 1.

¶20            Blanco filed a timely notice of appeal and we have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and -4033(A).

**ANALYSIS**

I.     *Motion to Suppress*

¶21            Blanco argues the trial court abused its discretion when it denied his motion to suppress statements made to law enforcement on January 10, 2017, during the non-custodial interview.[3]  Blanco contends the

---

[3]     On appeal, Blanco concedes he was not "in custody" during this interview.

statements should have been excluded because he expressly invoked his right to remain silent and right to have counsel present during the interview.

**¶22**        "We review the denial of a motion to suppress evidence for abuse of discretion, considering the facts in the light most favorable to sustaining the ruling." *State v. Weakland*, 246 Ariz. 67, 69, ¶ 5 (2019). In our review, we consider "only the facts presented to the superior court at the suppression hearing." *State v. Mendoza-Ruiz*, 225 Ariz. 473, 474, ¶ 2 n.1 (App. 2010).

**¶23**        In *Miranda v. Arizona*, the U.S. Supreme Court held that the prohibitions against self-incrimination contained in the Fifth and Fourteenth Amendments require a suspect be advised of his right to remain silent and right to have counsel present before a custodial interrogation. 384 U.S. 436, 479 (1966); *see* U.S. Const. amends. V, XIV; Ariz. Const. art. 2, §§ 4, 10. If an individual invokes his right to remain silent or right to counsel, the interrogation must cease. *Miranda*, 384 U.S. at 474.

**¶24**        Since the decision in *Miranda*, continuing precedent has made clear that *Miranda* and its progeny apply "only in the context of custodial interrogation. If the defendant is not in custody then those decisions do not apply; nor do they govern other, noninterrogative types of interactions between the defendant and the State." *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009); *accord State v. Yonkman*, 231 Ariz. 496, 498, ¶ 8 (2013). The court further emphasized, "When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering." *Id.*

**¶25**        Certainly, the privileges and protections of the Fifth and Fourteenth Amendments do not disappear simply because a suspect is in a non-custodial setting. However, as *Montejo* and *Yonkman* make clear, to assert those privileges in a non-custodial setting, a suspect need only leave and end contact with law enforcement.

**¶26**        Here, Blanco did just that. Although Blanco made statements midway through the interview asking for an attorney and asserting he would stop talking, officers were not required to cease questioning. *See State v. Lang*, 176 Ariz. 475, 484 (App. 1993) ("Police may continue to question suspects who are not in custody, even though they invoke their right to remain silent, as long as the responses are voluntary and the person's will has not been overborne."). When Blanco again stated that he did not want to talk without an attorney, he ended the interview and left the room. When Blanco left, officers did not try to get him to come back nor

did they have any further contact with him that day. On this record, the trial court did not abuse its discretion in denying Blanco's motion to suppress.

*II. Prosecutor's Comments*

**¶27** Blanco also contends that, as part of its case in chief, the State impermissibly commented on his invocations of his right to remain silent and right to counsel made during the January 10, 2017, interview.

**¶28** The State contends this argument is raised for the first time on appeal. We agree. Although Blanco points to a portion of the evidentiary hearing transcript as where he claims the argument was raised, the transcript portion referenced does not support his contention.

**¶29** We will review a constitutional claim raised for the first time on appeal, but our review is limited to determining whether fundamental, prejudicial error occurred. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005); *State v. Coleman*, 241 Ariz. 190, 192, ¶ 6 (App. 2016).

**¶30** However, our review of the record shows that, even assuming any error, evidence of Blanco's invocations of his right to remain silent and right to counsel were first introduced at trial by Blanco himself. Although the State introduced a recorded version of the January 10 interview, the recording was redacted and did not contain Blanco's invocations. In contrast, Blanco introduced as an exhibit a partial transcript of the interview, which did contain his statements that he did not want to speak to officers without an attorney. Because Blanco himself first introduced evidence of his invocations of the right to remain silent and right to counsel, the invited error doctrine bars any alleged error arising from improper statements made in response to that exhibit. *See State v. Logan*, 200 Ariz. 564, 565-66, ¶ 9 (2001) ("If an error is invited, we do not consider whether the alleged error is fundamental, for doing so would run counter to the purposes of the invited error doctrine. . . . [W]e will not find reversible error when the party complaining of it invited the error."); *State v. Escalante*, 245 Ariz. 135, 145, ¶ 38 (2018) ("[I]f defense counsel invited trial error, strategically or carelessly, the defendant cannot obtain appellate relief even if the error was fundamental and prejudicial.").

**¶31** Moreover, even regarding those statements not made in direct response to the exhibit entered by Blanco, we see no error. *See id.* at 142, ¶ 21 ("[T]he first step in fundamental error review is determining whether trial error exists. . . . The defendant bears the burden of persuasion."). First, as to Blanco's invocation of his right to counsel, the

record shows that aside from the interview transcript that Blanco himself entered into the record, there was no other discussion at trial of Blanco's request for an attorney. Accordingly, there was no error.

**¶32** As to Blanco's invocation of his right to remain silent, Blanco alleges the State improperly commented on his invocation multiple times during its closing argument. First, Blanco takes issue with the prosecutor's argument that Sanders would not have willingly spoken to police if he were the shooter. Blanco claims that by making this argument, the prosecutor implied Blanco was guilty for declining to talk to police. Second, Blanco complains that the prosecutor inappropriately emphasized Blanco's statements that he "[didn't] know nothing about nothing" and "[didn't] know anything" when given the opportunity to say the shooting was an accident. Blanco contends that the prosecutor's emphasis on his failure to state that the shooting was accidental improperly implied guilt.

**¶33** It is well-settled law that the State may not comment on a defendant's failure to testify at trial, either directly or indirectly. *See* U.S. Const. amend. V; Ariz. Const. art. 2, § 10; A.R.S. § 13-117(B); *see also Griffin v. California*, 380 U.S. 609, 613-14 (1965); *State v. Rutledge*, 205 Ariz. 7, 12, ¶ 26 (2003). "To determine whether a particular argument is improper, the statements must be examined in context to determine whether the jury would naturally and necessarily perceive them to be a comment on the failure of the defendant to testify." *State v. Schrock*, 149 Ariz. 433, 438 (1986); *see also State v. Hughes*, 193 Ariz. 72, 86, ¶ 62 (1998) (considering the "cumulative effect" of prosecutor's statements).

**¶34** In *Rutledge*, a prosecutor made comments during closing argument of a murder trial asking the jury to note that the defendant failed to mention an alibi witness during a videotaped interview with police. 205 Ariz. at 14, ¶ 37. On appeal, the court held the prosecutor's statements were not an improper comment on defendant's failure to testify because the prosecutor clearly referred to defendant's failure to name alibi witnesses, specifically referred to the videotaped interview, and did not refer to defendant's decision to not testify. *Id.* at ¶ 38.

**¶35** Here, the situation is highly analogous to *Rutledge*. In the face of Blanco's accident theory presented at trial, the prosecution referred to the fact that Blanco denied knowing anything about an accident in a recorded interview with law enforcement. The prosecutor mentioned that denial, but did not ever refer to Blanco's decision not to testify. *See also Schrock*, 149 Ariz. at 438-39 (holding a prosecutor's comment was permissible when it related only to the fact that the defendant's statements to the officers did

not support the alibi defense that defendant had pled). Additionally, the prosecutor's comments about Sanders talking to police were used to emphasize Sanders' credibility and state of mind, not as substantive evidence of Blanco's guilt based on failure to testify. Thus, taken in context, the jury would not "naturally and necessarily perceive" the prosecutor's remarks as a comment on Blanco's failure to testify. *See Schrock*, 149 Ariz. at 438.

### III. *Sufficiency of Evidence of Premeditation*

**¶36**     Blanco argues there was insufficient evidence of premeditation to support his conviction for first-degree murder.

**¶37**     We review *de novo* the sufficiency of the evidence supporting a conviction, as well as the denial of a motion for judgment of acquittal on that basis. *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011). In our review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at ¶ 16 (quoting *State v. Mathers*, 165 Ariz. 64, 66 (1990) (emphasis in original)).

**¶38**     We recognize "[t]he fact that a jury convicts a defendant does not in itself negate the validity of the earlier motion for acquittal." *Id.* at ¶ 17. Still, we "view the evidence in the light most favorable to sustaining the conviction, and, because the jury has returned its verdict and presumptively followed instructions, all reasonable inferences will be resolved against a defendant." *State v. Lee*, 189 Ariz. 608, 615 (1997).

**¶39**     Premeditation requires proof that, after forming an intent to kill, the defendant "reflected on the decision before killing." *State v. Thompson*, 204 Ariz. 471, 479, ¶ 32 (2003). The time needed for actual reflection may be very short, and evidence of reflection may be direct or circumstantial. *Id.* at ¶¶ 31-32.

**¶40**     Here, there was sufficient evidence for a rational trier of fact to find Blanco actually reflected on his decision to kill S.C. First, the wife of the friend S.C. was staying with testified that a few days before the murder, she ran into Blanco and he was "reeling," "flopping" his hands in the air, and yelled, "What the hell is wrong with [S.C.]? What's going on with [S.C.]? . . . I don't understand him anymore." *See State v. Wood*, 180 Ariz. 53, 62 (1994) ("[W]here the existence of premeditation is in issue, evidence of previous quarrels or difficulties between the accused and the victim is admissible." (internal quotation marks omitted)). Second, Blanco brought S.C. to the ranch house—a location around twenty miles outside of the city

that S.C. would have no obvious reason to visit. *See State v. Grell*, 205 Ariz. 57, 60, ¶ 21 (2003) (holding that "driving to a remote area," among other facts, supported a finding of premeditation). In addition, there was evidence presented that Blanco was in need of money, that he was behind on his mortgage, and that despite Blanco's representation that he gave S.C. the collected rent money on June 16, 2015, there was no money found with S.C.'s remains nor deposited into S.C.'s bank account. Finally, evidence showed that S.C. died after bleeding out from a shotgun shot, yet Blanco took no action to aid S.C. after the shot or to call 911, and instead buried the body. *See State v. Nelson*, 229 Ariz. 180, 185, ¶ 18 (2012) (finding a defendant's actions after a murder, including concealing evidence, can support a finding of premeditation); *State v. Sellers*, 106 Ariz. 315, 316 (1970) (noting defendant disposed of the victim's body when finding sufficient evidence of premeditation). In the face of this and other direct and circumstantial evidence presented at trial, we conclude the trial court properly found that the record contained substantial evidence to support a conviction for premediated first-degree murder.

### IV. Jury Instructions

**¶41** Blanco argues the trial court committed reversible error by denying his motion to include reckless manslaughter and negligent homicide in the jury instructions.

**¶42** We review a trial court's denial of a requested jury instruction for an abuse of discretion and "defer to the trial judge's assessment of the evidence." *State v. Wall*, 212 Ariz. 1, 3, 5, ¶¶ 12, 23 (2006). To warrant a separate instruction for a lesser-included offense, "the evidence must be such that a rational juror could conclude that the defendant committed only the lesser offense." *Id.* at 4, ¶ 18. "A party is entitled to an instruction on any theory reasonably supported by the evidence," but we "will not reverse a conviction if we can conclude, beyond a reasonable doubt, that the error had no influence on the verdict." *State v. Rodriguez*, 192 Ariz. 58, 61, 63, ¶¶ 16, 27 (1998).

**¶43** Here, the record shows the trial judge properly considered the evidence in determining whether to include instructions for manslaughter or negligent homicide. The trial court denied the lesser-included offense instructions because it found no evidence supporting the defense's theory that the killing was an accident, aside from Blanco's own representation to Sanders. Although defense counsel pointed to testimony by the medical examiner that the trajectory of the shot may have been consistent with the accident theory, the court reasoned that because the medical examiner also

10

testified that S.C. did not die immediately from the shot but from bleeding out freely for several minutes without any aid, there was no evidence to reasonably support the defense's accident theory. Accordingly, we see no abuse of discretion in the trial court's declining to include instructions for reckless manslaughter and negligent homicide.

¶44 Moreover, because the jury found Blanco guilty of first-degree murder rather than the lesser-included second-degree murder, any error as to instructions on other lesser-included offenses would necessarily be harmless. *See Nelson*, 229 Ariz. at 186, ¶ 24 ("When a jury is given a choice between first-degree murder and second-degree murder and convicts on first-degree murder, it has necessarily rejected manslaughter."); *State v. White*, 144 Ariz. 245, 247 (1985) ("[B]y finding defendant guilty of the highest offense, to the exclusion of the immediately lesser-included offense, second degree murder, the jury necessarily rejected all other lesser-included offenses. The error, if indeed it was error, of not instructing as to such offenses was harmless.").[4]

**CONCLUSION**

¶45 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[4] Blanco asserts that *White* and the resulting line of cases applying *White* are distinguishable from the case at hand because neither *White* nor its progeny consider the scenario where a lesser-included offense is not adequately covered by the other instructions, such as an accident scenario. We disagree with this distinction and conclude the precedent in *White* is applicable here. In finding Blanco guilty of first-degree murder in the face of the lesser-included second-degree murder, the jury necessarily rejected other lesser-included offenses. *See White*, 144 Ariz. at 247.