917 P.2d 200

**STATE of Arizona, Appellee,**

v.

**Danny Lee JONES, Appellant.**

No. CR–93–0541–AP.

Supreme Court of Arizona,
En Banc.

May 7, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Susanna C. Pineda, Assistant Attorney General, Phoenix, for State of Arizona.

Ron Wood's Law Office by Ronald D. Wood, Show Low, for Appellant.

## OPINION

CORCORAN, Justice (Retired).

Danny Lee Jones (defendant) was convicted in Mohave County Superior Court of two

counts of premeditated first degree murder and one count of attempted premeditated first degree murder. The trial court sentenced defendant to two consecutive death sentences for the murders and to a consecutive sentence of life imprisonment for the attempted murder. Defendant's convictions and sentences were automatically appealed to this court. A.R.S. § 13–4033; rules 26.15, 31.2(b), and 31.15(a)(3), Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035.

### *Factual and Procedural Background*

### I. Factual Background

In February 1992, defendant moved to Bullhead City, Arizona, and resumed a friendship with Robert Weaver. At this time, Robert, his wife Jackie, and their 7–year–old daughter, Tisha, were living in Bullhead City with Robert's grandmother, Katherine Gumina. As of March 1992, defendant was unemployed and was planning to leave Bullhead City.

On the night of March 26, 1992, defendant and Robert were talking in the garage of Ms. Gumina's residence. Robert frequently entertained his friends in the garage, and during these times, he often discussed his gun collection. The two men were sitting on inverted buckets on the left side of the garage, and Ms. Gumina's car was parked on the right side of the garage. Both defendant and Robert had been drinking throughout the day and had used crystal methamphetamine either that day or the day before.

At approximately 8:00 p.m., Russell Dechert, a friend of Robert's, drove to the Gumina residence and took defendant and Robert to a local bar and to watch a nearby fire. Dechert then drove defendant and Robert back to the Gumina residence at approximately 8:20 p.m. and left, telling defendant and Robert that he would return to the Gumina residence around 9:00 p.m.

Although there is no clear evidence of the sequence of the homicides, the scenario posited to the jury was as follows. After Dechert left, defendant closed the garage door and struck Robert in the head at least three times with a baseball bat. Robert fell to the ground where he remained unconscious and bleeding for approximately 10 to 15 minutes. Defendant then entered the living room of the Gumina residence where Ms. Gumina was watching television and Tisha Weaver was coloring in a workbook. Defendant struck Ms. Gumina in the head at least once with the baseball bat, and she fell to the floor in the living room.

Tisha apparently witnessed the attack on Ms. Gumina, ran from the living room into the master bedroom, and hid under the bed. Defendant found Tisha and dragged her out from under the bed. During the struggle, Tisha pulled a black braided bracelet off defendant's wrist. Defendant then struck Tisha in the head at least once with the baseball bat, placed a pillow over her head, and suffocated her, or strangled her, or both.

Defendant next emptied a nearby gun cabinet containing Robert's gun collection, located the keys to Ms. Gumina's car, and loaded the guns and the bat into the car. At some point during this time, Robert regained consciousness, and, in an attempt to flee, moved between the garage door and Ms. Gumina's car, leaving a bloody hand print smeared across the length of the garage door and blood on the side of the car. Robert then climbed on top of a work bench on the east side of the garage, leaving blood along the east wall. Defendant struck Robert at least two additional times in the head with the baseball bat, and, as Robert fell to the ground, defendant struck him in the head at least once more.

A few minutes before 9:00 p.m., Dechert returned to the Gumina residence and noticed that the garage door, which previously had been open, was closed. Dechert went to the front door and knocked. Through an etched glass window in the front door, he saw the silhouette of a person locking the front door and walking into the master bedroom. Dechert then looked through a clear glass portion of the window and saw defendant walk out of the master bedroom. He heard defendant say, "I will get it," as if he were talking to another person in the house. Defendant then opened the front door, closing it immediately behind him, walked out

onto the porch, and stated that Robert and Jackie had left and would return in about 30 minutes. Dechert noticed that defendant was nervous, breathing hard, and perspiring. Although Dechert felt that something was wrong, he left the Gumina residence. As he was leaving, Dechert heard the door shut as if defendant went back into the house. Shortly thereafter, defendant left the Gumina residence in Ms. Gumina's car.

At approximately 9:10 p.m., Jackie Weaver returned home from work. When she opened the garage door, she found Robert lying unconscious on the garage floor. Jackie ran inside the house and found Ms. Gumina lying on the living room floor and her daughter Tisha lying under the bed in the master bedroom. She then called the police, who on arrival determined that Tisha and Robert were dead and that Katherine Gumina was alive but unconscious. The medical examiner later concluded that Robert's death was caused by multiple contusions and lacerations of the central nervous system caused by multiple traumatic skull injuries. The cause of Tisha's death was the same as Robert's, but also included possible asphyxiation.

After leaving the Gumina residence, defendant picked up his clothes from a friend's apartment where he had been staying and drove to a Bullhead City hotel. At some point before reaching the hotel, he threw the bat out the car window. Defendant parked the car at the hotel and hailed a taxi cab to drive him to Las Vegas, Nevada. The police eventually recovered Ms. Gumina's car and found a pink baseball cap and a note, which were identified at trial as belonging to defendant.

When defendant arrived in Las Vegas, he gave the cab driver one of Robert's guns to pay for the fare and checked into a hotel. The next day, however, defendant met Marcia and Gary Vint and arranged to pay rent to sleep on the couch in their apartment. While at the apartment, he sold most of the remaining guns from Robert's collection. The police ultimately recovered several of the guns; two witnesses from Las Vegas testified that defendant sold them the guns, and Jackie Weaver identified the guns as Robert's.

A few days later, the Vints learned that defendant was a suspect in the Bullhead City murders. By then, defendant was staying at another apartment the Vints had rented, although his belongings were still at the original apartment. The Vints called the Las Vegas police, who arrested defendant and took possession of his belongings.

## II. Procedural Background

The state charged defendant with two counts of premeditated first degree murder and one count of attempted premeditated first degree murder. Although Katherine Gumina ultimately died as a result of the injuries defendant inflicted, the state chose not to amend the indictment. Defendant pleaded not guilty to all of the charges. At trial, defendant testified that he killed Robert Weaver in self-defense, that he struck Katherine Gumina reflexively and without criminal intent because she startled him, and that another person killed Tisha Weaver. The jury found defendant guilty of all three counts.

The trial court then held an aggravation/mitigation hearing. With respect to Robert's murder, the trial court found three aggravating circumstances: (1) defendant committed the murder for pecuniary gain, A.R.S. § 13–703(F)(5); (2) defendant committed the murder in an especially heinous, cruel, or depraved manner, A.R.S. § 13–703(F)(6); and (3) defendant was convicted of one or more other homicides that were committed during the commission of the offense, A.R.S. § 13–703(F)(8). With respect to Tisha's murder, the trial court found the above three aggravating circumstances and the additional aggravating circumstance that victim was under 15 years of age, A.R.S. § 13–703(F)(9).

With respect to both murders, the trial court found no statutory mitigating circumstances. The court did find that defendant proved the following nonstatutory mitigating circumstances by a preponderance of the evidence: (1) defendant suffers from long-term substance abuse; (2) at the time of the offense, defendant was under the influence of alcohol and drugs; (3) defendant had a cha-

otic and abusive childhood; and (4) defendant's substance abuse problem may have been caused by genetic factors and aggravated by head trauma. The trial court concluded, however, that these circumstances were not sufficiently substantial to outweigh the aggravating circumstances or to call for leniency and sentenced defendant to two consecutive death sentences. The court also sentenced defendant to a consecutive sentence of life imprisonment, without the possibility of release or parole for 25 years, for the attempted first degree murder of Ms. Gumina. The convictions and sentences were automatically appealed to this court.

### Issues Presented

We address the following issues raised in defendant's brief. The pretrial issues are:

1. Whether the trial court erroneously denied defendant's motion to suppress evidence that the police obtained while searching defendant's bags; and

2. Whether the trial court erroneously denied defense counsel's motion to withdraw based on a potential conflict of interest.

The trial issues are:

1. Whether the trial court erroneously denied defendant's motion for mistrial based on an alleged violation of rule 9.3(a), Arizona Rules of Criminal Procedure;

2. Whether the trial court erroneously denied defendant's motion for mistrial based on alleged improper influence on the jury;

3. Whether the trial court erroneously admitted autopsy photographs of Tisha Weaver and Katherine Gumina; and

4. Whether the trial court erroneously denied defendant's motion for mistrial based on the admission of two prior misdemeanor theft convictions as impeachment evidence.

The sentencing issues are:

1. Whether the trial court erroneously found that defendant murdered Tisha and Robert Weaver for pecuniary gain;

2. Whether the trial court erroneously found that defendant murdered Tisha

and Robert Weaver in an especially heinous, cruel, or depraved manner; and

3. Whether the trial court erroneously denied defendant's motion to continue the sentencing hearing to allow further testing to determine if defendant suffers from organic brain disorder.

### Discussion

## I. Pretrial Issues

### A. Search and Seizure of Defendant's Belongings

Defendant raises three arguments related to the evidence the police obtained from the search and seizure of his belongings. Specifically, he challenges the seizure of his belongings by the Las Vegas police, the subsequent search by the Bullhead City police detectives, and the inventory search by the Las Vegas police. We address these arguments in turn and set forth the relevant facts as follows.

In Las Vegas, Nevada, defendant met Marcia and Gary Vint and arranged to pay them $50 per week to sleep on the couch at their apartment (the Arville Street apartment). During the first couple of days, defendant gave the Vints $50, apparently to pay for groceries. Defendant kept his belongings, which were contained in a duffel bag, a backpack, and a white trash bag, in one side of the apartment's dining room closet. The Vints also kept things in this closet.

On March 30, the Vints leased a new apartment (the Ida Street apartment), to which they planned to move on March 31. On March 30, defendant spent the night at the Ida Street apartment, although his belongings remained at the Arville Street apartment. On the morning of March 31, the Vints read in the newspaper that a person named Danny Lee Jones was suspected of murdering Tisha and Robert Weaver. The Vints looked through defendant's belongings to verify his name and then notified the Las Vegas police that defendant was staying with them.

The police arrested defendant that day at the Ida Street apartment. The police then returned to the Arville Street apartment be-

cause the Vints told them that defendant had left some belongings there which they did not want to keep. The police took possession of defendant's belongings from the dining room closet and a .22 rifle, identified as similar to one that Robert owned, found under the living room sofa. They also conducted a cursory search of defendant's bags to check for weapons and placed the items in the trunk of the patrol car. The police did not have a search warrant.

While the Las Vegas police were still at the Arville Street apartment, two Bullhead City police detectives arrived and searched defendant's belongings, which were being stored in the trunk of a patrol car. The Bullhead City detectives, who also did not have a search warrant, identified the blood-stained clothing that defendant wore on the night of the murders. The Las Vegas police then impounded all of defendant's belongings and conducted an inventory search at the police station.

■ Before trial, defendant moved to suppress the clothing that the police obtained from the Arville Street apartment, but not the .22 rifle. The trial court held that the Vints had authority to consent to the search and seizure of defendant's property because defendant did not have exclusive authority over any area of the Arville Street apartment, the Vints believed they had no further duty to store defendant's belongings, and defendant had no agreement for indefinite storage of his property at the apartment. The court also held that any subsequent searches or seizures were valid. We review a trial court's denial of a motion to suppress under a clear abuse of discretion standard. *State v. Atwood*, 171 Ariz. 576, 603, 832 P.2d 593, 620 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

### 1. Initial Search and Seizure of Defendant's Belongings by the Las Vegas Police

Defendant argues that the Las Vegas police illegally seized his belongings from the Arville Street apartment because they did not have a search warrant and the Vints lacked authority to turn the property over to the police. Defendant first asserts that he

and the Vints had established a landlord-tenant relationship and that, under Nevada law, a landlord is required to store a tenant's property safely for 30 days after the abandonment or eviction of the tenant or the end of the rental period. *See* Nev.Rev.Stat. § 118A.460(1)(a) (Supp.1995). Defendant asserts that the Vints violated this statute when they allowed the Las Vegas police to seize his belongings.

■ Defendant, however, raises this argument for the first time on appeal. An issue not raised below is waived absent fundamental error, and we find none here. *State v. Bolton*, 182 Ariz. 290, 297, 896 P.2d 830, 837 (1995); *see also State v. Gendron*, 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991), quoting *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977) (defining fundamental error as "error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial"). Even if we assume that this statute applies and that the Vints violated it, the remedy would be civil or criminal liability on the part of the Vints and not suppression. *See* Nev.Rev.Stat. § 118A.460(1)(a). Therefore, the argument, even if accepted, would not have affected the trial's outcome.

■ Defendant next argues that the seizure of his belongings was unconstitutional because the Vints lacked authority to consent to the seizure. Generally, the police must obtain a warrant before searching or seizing premises or property in which an individual has a reasonable expectation of privacy. U.S. Const. amends. IV & XIV; *see also Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); *State v. Castaneda*, 150 Ariz. 382, 389, 724 P.2d 1, 8 (1986). An exception to this requirement, however, exists where a third party with "common authority over or other sufficient relationship to the premises or effects sought to be inspected" voluntarily consents to the search or seizure. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *see also Castaneda*, 150 Ariz. at 389, 724 P.2d at 8. The state must prove consent by "clear and positive evi-

dence." *State v. Lucero,* 143 Ariz. 108, 110, 692 P.2d 287, 289 (1984).

In this case, the parties do not contest that defendant had a reasonable expectation of privacy regarding his belongings at the Vints' apartment or that the Vints' consent was voluntary. Thus, our inquiry focuses on the Vints' authority over and relationship to defendant's property. The Court in *Matlock* explained that common authority exists when there is

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7; *see also State v. Heberly,* 120 Ariz. 541, 543–44, 587 P.2d 260, 262–63 (App.1978) (adopting this language). Moreover, when determining whether common authority exists, the focus is on apparent authority, rather than actual authority. *Castaneda,* 150 Ariz. at 389, 724 P.2d at 8 ("[I]f it reasonably appeared that a third party had common authority over the premises, then the consent to search would be valid.").

We find that the trial court did not abuse its discretion when it denied defendant's motion to suppress on the basis that the Vints had apparent authority to consent to the search. The uncontroverted evidence at trial was that the Vints had joint access to and control over the dining room closet where defendant's belongings were found and that defendant did not have the right to exclude them from this area. Moreover, it was reasonable to recognize that defendant assumed the risk that the Vints would allow the common area to be searched when defendant chose to leave his belongings at the Arville Street apartment. Therefore, the seizure of defendant's belongings was proper.

### 2. Search by the Bullhead City Police Detectives

Defendant next argues that the warrantless search by the Bullhead City police detectives of his belongings while they were in the Las Vegas police patrol car was unconstitutional. Defendant reasons that the search does not fall within the inventory exception to the warrant requirement because the Las Vegas police department's standard inventory procedures do not include "interim" searches.

Although defendant correctly asserts that this search does not fall within the inventory exception, the evidence is admissible under the inevitable discovery doctrine. The inevitable discovery doctrine, which is an exception to the exclusionary rule, provides that illegally obtained evidence is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the illegally seized items or information would have inevitably been seized by lawful means...." *State v. Ault,* 150 Ariz. 459, 465, 724 P.2d 545, 551 (1986), citing *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *see also State v. Lamb,* 116 Ariz. 134, 138, 568 P.2d 1032, 1036 (1977) ("[E]vidence obtained as a result of an unlawful search need not be suppressed where, in the normal course of the police investigation and absent the illicit conduct, the evidence would have been discovered anyway.").

In this case, the Bullhead City police detectives searched defendant's belongings while they were in the trunk of the Las Vegas police patrol car, which was parked at the Arville Street apartment. During the search, the detectives discovered the clothing defendant wore on the night of the murders. When the detectives finished their search, the Las Vegas police transported defendant's belongings to the police station and conducted a lawful inventory search, which we discuss below. The Las Vegas police inevitably would have conducted their inventory search and found defendant's clothing, regardless of whether the Bullhead City detectives identified defendant's clothing. Therefore, the trial court did not abuse its discretion when it denied defendant's motion to suppress the evidence on this basis.

### 3. Inventory Search by the Las Vegas Police

Defendant's final argument regarding the search and seizure of his belongings is that

the inventory search by the Las Vegas police was unconstitutional because the police did not conduct the search pursuant to standardized criteria. Because defendant did not make this argument in his motion to suppress, our inquiry is limited to fundamental error analysis. *See State v. Bolton*, 182 Ariz. 290, 297, 896 P.2d 830, 837 (1995) (issue not raised with trial court is waived absent fundamental error).

 Even if defendant had properly preserved the issue, his argument lacks merit. Inventory searches are permissible if "conducted pursuant to standardized criteria and not because of mere suspicions of criminal activity." *State v. West*, 176 Ariz. 432, 441, 862 P.2d 192, 201 (1993), *cert. denied*, ── U.S. ──, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994) (testimony that police policy was to list contents of vehicles taken into possession sufficient to find valid inventory search). In this case, an officer testified at the suppression hearing that the Las Vegas police conduct an inventory search whenever they obtain evidence, which includes listing each item of evidence on an impound sheet and placing the evidence into an evidence vault, and that they followed this procedure in this case. The officer's testimony is sufficient to establish that the police followed standardized criteria when they conducted the inventory search, and the search presents neither error nor fundamental error.

### B. Defense Counsel's Motion to Withdraw

Approximately two weeks before trial, defense counsel learned that Cordell Reid, who was defendant's cellmate, would testify that the day before the murders he saw Robert Weaver and an unknown person arguing in the backyard of the Gumina residence, and that on the night of the murders he saw a small blue car and a white car leaving the Gumina residence. Reid's testimony would corroborate defendant's claim that he killed Robert in self-defense and that someone else murdered Tisha.

After learning of Reid, the state interviewed him and, 4 days before trial, disclosed him as a potential witness for the state. The

next day, defense counsel, a public defender, moved to withdraw from representing defendant because the public defender's office previously had represented Reid, and defense counsel and another public defender had discussed the prior representation and Reid's general character. Defense counsel argued that he would have to withdraw unless the state guaranteed that Reid would not be called as a witness. After a hearing on the issue, during which the state asserted that it did not intend to call Reid as a witness, the trial judge denied defense counsel's motion but stated that he would reconsider the issue if and when the state actually called Reid to testify.

On appeal, defendant argues that the trial court should have allowed defense counsel to withdraw because defense counsel had a conflict of interest and because the state's listing of Reid as a potential witness created the appearance of impropriety. Defendant further argues that the denial of the motion violated the United States and Arizona Constitutions because it denied defendant the opportunity to call a witness.

 We will overturn a trial court's decision on a motion to withdraw only if the trial court abused its discretion. *Okeani v. Superior Court*, 178 Ariz. 180, 181, 871 P.2d 727, 728 (App.1993). In this case, the trial court acted well within its discretion. First, no conflict of interest developed in this case because neither the state nor defense counsel called Reid as a witness at trial. The trial court properly reserved ruling on this issue until any actual conflict arose, and, because Reid did not testify, we need not address whether his testimony ultimately would have resulted in a conflict for defense counsel. Second, contrary to defendant's assertions, the trial court's order did not preclude defense counsel from calling Reid as a witness. If defendant is in fact arguing that defense counsel's decision not to call Reid to testify was ineffective assistance of counsel, he must do so in a proceeding for post-conviction relief. *See State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989) ("We will not reverse a conviction on ineffective assistance of counsel grounds on direct appeal absent a

separate evidentiary hearing concerning counsel's actions or inactions.").

## II. Trial Issues

### A. Alleged Violation of Rule 9.3(a), Arizona Rules of Criminal Procedure

Before trial began, defendant asked the court to exclude prospective witnesses from the courtroom. Rule 9.3(a), Arizona Rules 14, 15 of Criminal Procedure, requires the court, at the request of either party, to exclude prospective witnesses from the courtroom during opening statements and the testimony of other witnesses and to direct the witnesses not to communicate with each other.[1] In addition, rule 9.3(d) provides that when the rule has been invoked, the parties "shall nevertheless be entitled to the presence of one investigator at counsel table." In this case, the state designated Detective Jerry Duke, who also was a witness for the state, as its investigator. The trial court did not state on the record whether Duke was entitled to speak with other witnesses for the state during the trial.

At trial, Samuel Howe, a blood spatter expert for the state, testified about blood shown in photographs of the victims and the crime scene. During a recess in the middle of Howe's direct examination, defense counsel saw Duke talking with Howe and motioning toward the photographs to which Howe's testimony had referred. Howe continued testifying after the recess, and defense counsel cross-examined him but did not ask him about his conversation with Duke.

At the conclusion of Howe's testimony, defense counsel told the court about the conversation between Howe and Duke and asked the court to strike Howe's testimony or, alternatively, to declare a mistrial. The trial judge questioned Duke about the conversation, and Duke stated that he had asked Howe about an opinion that Howe had given before the recess, because Duke had an alternative opinion, but that Howe's post-recess testimony remained consistent with his pre-recess testimony, despite the conversation. Defense counsel also asked the trial

judge to question Howe about the conversation, and the judge agreed to do so. The judge stated, however, that he wanted to question the bailiff about another issue first. After questioning the bailiff, the judge did not question Howe about the conversation but instead asked whether the parties had anything further to present on either issue. Both parties stated that they did not, and the trial judge declined to strike Howe's testimony or to declare a mistrial.

On appeal, defendant argues that the trial judge should have declared a mistrial because the conversation between Duke and Howe violated rule 9.3(a). Defendant further argues that the conversation was prejudicial because Howe's testimony was the only evidence that directly refuted defendant's self-defense claim. Finally, defendant argues that the trial judge improperly refused to question Howe about the conversation and, as a result, precluded defendant from making an adequate record.

■ If a witness violates rule 9.3(a), the trial court has discretion when deciding whether to admit that witness's testimony. *State v. Gulbrandson*, 184 Ariz. 46, 63, 906 P.2d 579, 596 (1995). We will reverse the trial court's decision only when the defendant shows that the trial court abused its discretion and that the defendant suffered prejudice. *Gulbrandson*, 184 Ariz. at 63, 906 P.2d at 596.

■ Assuming without deciding that the prohibition against talking to other witnesses applies to the investigator-witness designated under rule 9.3(d), Arizona Rules of Criminal Procedure, there is no indication that Duke improperly influenced Howe. Rather, Duke testified that Howe's pre-recess and post-recess testimony was consistent, and defendant has not presented any evidence to the contrary. Moreover, defendant chose not to cross-examine Howe regarding the conversation. Therefore, we find that the trial court did not abuse its discretion and defendant has not shown prejudice.

1. A similar rule is codified at rule 615, Arizona Rules of Evidence.

484

## B. Alleged Improper Jury Influence

During the trial, defendant saw the bailiff smile at Samuel Howe, the state's blood spatter expert, when Howe took the stand to testify. Defendant disclosed the conduct to the court and asked the court to instruct the bailiff not to influence the jury. The trial court noted that it did not notice any inappropriate behavior but nonetheless questioned the bailiff about that instance and about a conversation the bailiff had with Howe during a recess. The bailiff stated that he and Howe mostly discussed Howe's father but that the trial "probably was mentioned." The court then allowed defense counsel to question the bailiff, and during that questioning, the bailiff stated that he and Howe started their conversation next to the jury box but that they moved when the jury returned to the courtroom and that he was sure that the jury could not overhear the conversation.

After questioning the bailiff, defendant moved for a mistrial, arguing that the conversation between the bailiff and Howe created the impression for the jury that Howe was a credible witness and that the jury may have overheard the conversation. The trial court denied defendant's motion for a mistrial, stated that it would instruct the bailiff not to talk with any of the witnesses in the case, and admonished the jury to disregard any interaction between the bailiff, or any other court personnel, and any witness.

Defendant argues on appeal that the trial court should have granted a new trial because the conversation between the bailiff and Howe improperly influenced the jury. Defendant also argues that the trial court abused its discretion when it denied defense counsel's request to inquire further into the issue.

■ As a general rule, "[j]urors and witnesses should avoid any contact or conversation during trial." *State v. Lang,* 176 Ariz.

475, 482, 862 P.2d 235, 242 (App.1993). However, "[s]uch improper contact is not grounds for a mistrial unless the defense establishes that the misconduct was prejudicial or that prejudice can fairly be presumed." *Lang,* 176 Ariz. at 482, 862 P.2d at 242. Moreover, we will not overturn a trial court's decision to grant or deny a new trial because of alleged improper contact with the jury absent a clear abuse of discretion. *Lang,* 176 Ariz. at 482, 862 P.2d at 242.

■ In this case, the trial court did not observe any inappropriate behavior by either the bailiff or Howe that would influence the jury. The court conducted an evidentiary hearing and learned that the conversation may have mentioned the trial but that the jury probably could not overhear the conversation. The court also admonished the jury to disregard any interaction between the bailiff and any of the witnesses. We therefore conclude that the trial court acted within its discretion when it determined that the conversation between the bailiff and Howe was not prejudicial.

## C. Admissibility of Autopsy Photographs

■ Defendant argues on appeal that the trial court abused its discretion when it admitted into evidence 5 autopsy photographs of Tisha Weaver and Katherine Gumina.[2] At trial, defendant filed a motion in limine objecting to the admissibility of several photographs. That motion did not object to the autopsy photographs of Tisha Weaver and Katherine Gumina; rather, it conceded that the autopsy photographs of Tisha Weaver "might be helpful in explaining certain medical testimony" and stated that defendant had not yet received any autopsy photographs of Katherine Gumina. At the hearing on the motion, defendant relied on his written brief. Moreover, when the state moved to admit the photographs into evidence at trial, including the autopsy photographs of Katherine Gumi-

2. Although defendant lists the admissibility of the crime scene photographs as an issue in his brief, he concedes in the text of his brief that the trial court acted within its discretion when it admitted these photographs. We have reviewed all of the crime scene photographs. Some graphically depict the brutal nature of the crime; however, they were relevant, not unduly cumulative, and not so gruesome so as to incite or inflame the jury. *See State v. Gulbrandson,* 184 Ariz. 46, 60, 906 P.2d 579, 593 (1995). We conclude that the trial court properly admitted the photographs and find no fundamental error.

na, defendant stated that he had no objection. Thus, defendant has waived this argument absent fundamental error. *State v. Bolton,* 182 Ariz. 290, 297, 896 P.2d 830, 837 (1995).

We find that the admission of the photographs was not fundamental error. A photograph is admissible if (1) the photograph is relevant to an issue in the case, and (2) the photograph does not have a tendency to incite or inflame the jury. *State v. Gulbrandson,* 184 Ariz. 46, 60, 906 P.2d 579, 593 (1995). Exhibit 125 depicts bone fractures on the back of Ms. Gumina's skull, and exhibits 129–31 depict injuries to Tisha's skull and brain. These photographs were relevant to illustrate the medical examiner's testimony, to show the cause of Ms. Gumina's and Tisha's deaths and the similarities of their injuries, and to refute defendant's claim that another person killed Tisha. Finally, exhibit 132 depicts the flushed condition of Tisha's face, which supports the conclusion that she was strangled or suffocated.

Although these photographs are gruesome, they are clinical in nature. Only one depicts a victim's face. Indeed, without any accompanying explanation, discerning which victim is the subject of each photograph is difficult, with the exception of the photograph of Tisha's face. In contrast to the other photographs, the one of Tisha's face is taken at an angle such that the blunt force injury to her head is not visible. Therefore, we conclude that the photographs were relevant and not unfairly prejudicial, and their admission was not error.

### D. Impeachment with Prior Misdemeanor Theft Convictions

The trial court held a pretrial hearing to determine whether the state could impeach defendant with 5 prior convictions pursuant to rule 609(a), Arizona Rules of Evidence. Under that rule, a prior conviction is admissible to impeach if the crime "(1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or (2) involved dishonesty or false statement, regardless of the punishment." The convictions at issue were: (1) misdemeanor larceny in 1983, (2) felony

attempted grand larceny in 1984, (3) misdemeanor theft in 1990, (4) misdemeanor theft in 1991, and (5) felony theft in 1991. After the hearing, the trial court ruled that the 1983 misdemeanor conviction was not admissible but that the 1984 and 1991 felony convictions were admissible. The court took the issue of the 1990 and 1991 misdemeanor convictions under advisement.

At a later pretrial hearing, the court again heard oral argument about the remaining two misdemeanor convictions. The state argued that the misdemeanors were admissible if they involved "moral turpitude" and that "theft falls into that category." Defendant responded that the misdemeanor convictions should be excluded as unfairly prejudicial. Ultimately, the trial court ruled that the convictions were admissible for impeachment purposes, and the state impeached defendant at trial with these misdemeanor convictions and the two felony convictions.

On appeal, defendant argues that the trial court should have excluded the 1990 and 1991 misdemeanor theft convictions under rule 609(a) because theft is not a crime involving dishonesty or false statement. Defendant further argues that the error was not harmless because defendant's credibility was critical to his case, the convictions were relatively recent, and the convictions were related to the state's theory of the motive for the murders. In response, the state concedes that the trial court erred but argues that the error was harmless because the misdemeanor convictions were merely cumulative in light of the other properly admitted impeachment evidence.

Where a defendant raises only a general objection to evidence at trial, the argument is waived, and our review is limited to whether admission of the evidence constituted fundamental error. *State v. Walker,* 181 Ariz. 475, 481, 891 P.2d 942, 948 (App. 1995); *see also* Ariz.R.Evid. 103(a)(1); Udall, *Evidence* § 12, at 18. In this case, defendant argued at trial that the convictions were inadmissible because they were unfairly prejudicial. Defendant did not assert, as he does now, that the convictions were inadmissible because they did not involve dishonesty or

false statement, and therefore, he has waived this argument.

 Even if we assume that the trial court erred and defendant preserved the issue, the error was harmless. Error is harmless if it can be shown beyond a reasonable doubt that the error did not affect the verdict. *State v. Lundstrom,* 161 Ariz. 141, 150, 776 P.2d 1067, 1076 (1989); *see also Chapman v. California,* 386 U.S. 18, 22–23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Although the misdemeanor convictions were relatively recent and related to the state's theory with respect to motive, the state properly impeached defendant with the 1991 felony theft and 1984 felony attempted grand larceny convictions. Moreover, overwhelming evidence at trial connected defendant with the murders. Thus, we can conclude beyond a reasonable doubt that the error did not affect the verdict, and admission of the convictions to impeach defendant was not fundamental error.

## III. Sentencing Issues

### A. Aggravating Circumstances

Regarding Robert Weaver's murder, the trial court found three aggravating circumstances: (1) defendant committed the murder for pecuniary gain, A.R.S. § 13–703(F)(5); (2) defendant committed the murder in an especially heinous, cruel, or depraved manner, A.R.S. § 13–703(F)(6); and (3) defendant was convicted of one or more other homicides that were committed during the commission of the offense, A.R.S. § 13–703(F)(8). Regarding Tisha Weaver's murder, the trial court found the above 3 aggravating circumstances and that the victim was under 15 years of age, A.R.S. § 13–703(F)(9).

 The state must prove aggravating circumstances beyond a reasonable doubt. *State v. Rockwell,* 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989). Defendant does not challenge the (F)(8) and (F)(9) aggravating circumstances on appeal, and our review of the record confirms that they were proved beyond a reasonable doubt. *See State v. Greenway,* 170 Ariz. 155, 167–68, 823 P.2d 22, 34–35 (1991) (explaining that the (F)(8) aggravating factor applies to multiple murders); *State v. Gallegos,* 178 Ariz. 1, 15, 870 P.2d 1097, 1111, *cert. denied,* — U.S. —, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994) (finding (F)(9) aggravating factor where defendant was tried as an adult and the victim was younger than 15). We now discuss the (F)(5) and (F)(6) aggravating circumstances.

### 1. Pecuniary Gain

 Defendant argues on appeal that the evidence presented at trial was not sufficient to support the trial court's finding that defendant committed the murders in the expectation of pecuniary gain. The trial court may not find pecuniary gain in every case in which "a person has been killed and at the same time defendant has made a financial gain." *State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986). Rather, the expectation of pecuniary gain must be a motive, cause, or impetus for the murder and not merely a result of the murder. *State v. Spencer,* 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993), *cert. denied,* 510 U.S. 1050, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994).

 We find that the record supports the trial court's finding of pecuniary gain. At the time of the murders, defendant was not working and had only a small amount of money. Defendant was living with a friend, but on the day before the murders that friend told defendant that he could not live with her anymore. Defendant knew that warrants were pending for his arrest, and he wanted to leave Bullhead City. Finally, defendant knew about Robert Weaver's gun collection. Because ample evidence shows that defendant murdered Tisha Weaver and Robert Weaver as part of a plan to obtain the gun collection and leave Bullhead City, we conclude that the trial court properly found the aggravating circumstance of pecuniary gain.

### 2. Especially Heinous, Cruel, or Depraved

 The especially heinous, cruel, or depraved aggravating circumstance is phrased in the disjunctive; if any one of the three factors is found, the circumstance is satisfied.

*State v. Murray,* 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995).

### a. Cruelty

■ Cruelty focuses on the victim's state of mind and exists when the defendant "inflicts mental anguish or physical abuse before the victim's death." *State v. Walton,* 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989). Mental anguish results when the victim experiences significant uncertainty about his or her ultimate fate. *Murray,* 184 Ariz. at 37, 906 P.2d at 570. Moreover, we have held that "when a victim is bludgeoned to death, the state must prove beyond a reasonable doubt that the victim experienced pain before losing consciousness." *State v. Kiles,* 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993), *cert. denied,* 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994) (cruelty found where victim regained consciousness).

■ We find that the record supports the trial court's finding of cruelty beyond a reasonable doubt with respect to both murders. Regarding Robert Weaver's murder, the trial court found that "Robert ... had time to contemplate his fate as he fled from the defendant" and that "[t]he killing therefore was cruel." The physical evidence and expert testimony at trial showed that after the initial blows, Robert fell to the ground, where he remained unconscious and bleeding for at least 10 to 15 minutes. Robert then moved between the garage door and Katherine Gumina's car, leaving a bloody handprint smeared across the length of the garage door and blood on the side of the car, and climbed on top of a work bench, leaving blood along the east wall. This evidence is sufficient to establish that Robert regained consciousness and experienced pain and uncertainty about his fate and thus is sufficient to uphold the trial court's finding of cruelty. *See Kiles,* 175 Ariz. at 371, 857 P.2d at 1225.

■ Regarding Tisha Weaver's murder, the trial court found that Tisha had time to contemplate her fate. She knew that her great-grandmother had been attacked, and she struggled with defendant for her life. The following evidence was presented at trial: (1) although Tisha was wearing pajamas when the police discovered her body, the beds were still made and she had not yet gone to bed when the murders occurred; (2) a child's workbook and colored pencils were in the living room; (3) Tisha's body was under the master bedroom bed with her legs spread and marks on the carpet indicated that she had been pulled out from under the bed; and (4) the police found a black bracelet, similar to one that defendant had been seen wearing, next to Tisha's head. Although we cannot conclusively determine whether Tisha witnessed defendant attacking Katherine Gumina, sufficient evidence supports our conclusion that Tisha was awake when the murders occurred, that she hid under her parents' bed because she was afraid, and that she struggled with defendant and pulled the bracelet off his wrist. Therefore, we can conclude beyond a reasonable doubt that she experienced uncertainty about her fate and that the murder was cruel.

### b. Heinous or Depraved

■ Heinousness and depravity focus on the defendant's state of mind and attitude at the time of the murders. *Murray,* 184 Ariz. at 37, 906 P.2d at 570. We look for the following circumstances when determining whether a crime is especially heinous or depraved: (1) apparent relishing of the murder; (2) infliction of gratuitous violence; (3) mutilation of the victim's body; (4) senselessness of the crime; and (5) helplessness of the victim. *State v. Gretzler,* 135 Ariz. 42, 51–52, 659 P.2d 1, 10–11 (1983). The last two factors are less probative of a defendant's state of mind than the first three. *Murray,* 184 Ariz. at 37–38, 906 P.2d at 570–71, citing *State v. King,* 180 Ariz. 268, 287, 883 P.2d 1024, 1043 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995) ("[O]nly under limited circumstances will the senselessness of a murder or the helplessness of the victim ... lead to [finding heinousness or depravity]."). Additionally, evidence that the murder was committed to eliminate a witness can support a finding of heinousness and depravity. *State v. Ross,* 180 Ariz. 598, 606, 886 P.2d 1354, 1362 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995).

Regarding Robert Weaver's murder, the trial court found that defendant inflicted gratuitous violence on Robert, that the murder was senseless, and that Robert was helpless. After the first blows, Robert was unconscious and bleeding, and he did not pose an obstacle to defendant's goal of taking the guns. *State v. West*, 176 Ariz. 432, 448, 862 P.2d 192, 208 (1993), *cert. denied*, — U.S. —, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994) (murder is senseless if unnecessary to achieve defendant's goal). Although Robert regained consciousness, it appears that he was attempting to flee and was not attempting to stop defendant from taking the guns. Even if he was attempting to stop defendant, he more than likely was no longer physically capable of doing so. Additionally, the initial blows rendered Robert helpless. Thus, the record supports the trial court's finding of senselessness and helplessness beyond a reasonable doubt.

■ The record also supports the trial court's finding that defendant inflicted gratuitous violence on Robert. Gratuitous violence is violence clearly beyond that necessary to cause death. *State v. Greenway*, 170 Ariz. 155, 166, 823 P.2d 22, 33 (1991). At trial, the blood spatter expert testified that, after the initial blows, Robert regained consciousness, attempted to flee, and climbed on top of a work bench. The expert further testified that, while Robert was on the work bench, defendant struck him at least two additional times in the head with the baseball bat, and, as he fell to the ground, defendant struck him in the head at least once more. The medical examiner testified that each of the blows defendant rendered were sufficient to cause death. We therefore conclude beyond a reasonable doubt that defendant inflicted gratuitous violence on Robert.

Regarding Tisha Weaver's murder, the trial court found that her murder was heinous and depraved because she was helpless, her murder was senseless, the only motive for her murder was to eliminate her as a witness, and defendant inflicted gratuitous violence. We agree that the murder was senseless, because Tisha, a 7–year–old child, did not present an obstacle to defendant's goal of

taking Robert's guns, and that she was a helpless victim.

■ We find, however, that the record does not support the trial court's finding that defendant murdered Tisha to eliminate her as a witness. As we stated above, evidence of witness elimination can support a finding of heinousness and depravity. We have held, though, that such evidence must fall into one of three categories: (1) "the murder victim is a witness to some other crime, and is killed to prevent that person from testifying about the other crime"; (2) the defendant has stated that witness elimination was a motive for the murder; or (3) "extraordinary circumstances of the crime show, beyond a reasonable doubt, that witness elimination is a motive." *Ross*, 180 Ariz. at 606, 886 P.2d at 1362; *see also State v. Barreras*, 181 Ariz. 516, 523, 892 P.2d 852, 859 (1995). Moreover, the third category occurs only in the "most extreme" cases. *Ross*, 180 Ariz. at 606, 886 P.2d at 1362 (finding only one example of third category in prior cases).

This case does not fall within the first category because there is no clear evidence of the sequence of the homicides, and we cannot determine conclusively whether Tisha directly witnessed the attack on Ms. Gumina. We leave open the question of whether "some other crime" can include a crime that was committed before the murder at issue but that occurred during the same time period as the murder at issue, such as in a case involving multiple homicides. Additionally, this case does not fall within the second category because review of the record reveals that defendant has not stated that he killed Tisha to eliminate her as a witness. Finally, this case does not fall within the third category because it is not the "extreme" case in which we can conclude beyond a reasonable doubt that witness elimination was the motive for Tisha's murder. Therefore, witness elimination does not support a finding of heinousness and depravity in this case.

■ The record does support the trial court's finding of gratuitous infliction of violence. The evidence at trial showed that defendant struck Tisha in the head with the baseball bat at least twice and that he then placed a pillow over her head and suffocated

her, strangled her, or both. The medical examiner testified that the head injuries were most likely fatal. He also testified that Tisha may have continued breathing for a short period after the head injuries. However, defendant had struck Tisha with the baseball bat with sufficient force to create a wound several inches wide, extending from her left ear to her left cheek. He then struck her a second time on the back of her head. After delivering these two fatal blows, defendant then asphyxiated her, far exceeding the amount of violence necessary to cause death. We therefore find beyond a reasonable doubt that defendant inflicted gratuitous violence on Tisha.

## B. Mitigating Circumstances

In addition to the statutory mitigating circumstances listed in A.R.S. § 13–703(G), the sentencing judge must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appropriate." *State v. West,* 176 Ariz. 432, 449, 862 P.2d 192, 209 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994), quoting *State v. McCall,* 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983); *see also* A.R.S. § 13–703(G). The defendant must prove the existence of mitigating circumstances by a preponderance of the evidence, and the trial court has the discretion to decide how much weight to give each mitigating circumstance that the defendant offers. *West,* 176 Ariz. at 449, 862 P.2d at 209.

At the sentencing hearing, defendant asserted the following statutory mitigating circumstances: (1) A.R.S. § 13–703(G)(1) (defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was significantly impaired); and (2) A.R.S. § 13–703(G)(2) (defendant was under unusual and substantial duress). Additionally, defendant raised the following non-statutory mitigating circumstances: (1) victims' family's alleged "indifference" to imposition of the death penalty; (2) chaotic and abusive childhood; (3) potential for rehabilitation; (4) lack of future dangerousness if confined to prison; (5)

participation of another individual; (6) history of substance abuse and intoxication at the time of the offenses; (7) head injuries; (8) mental illness; and (9) remorse.

In its special verdicts, the trial court found no statutory mitigating circumstances. The trial court did find that defendant proved the following non-statutory mitigating circumstances by a preponderance of the evidence: (1) defendant suffers from long-term substance abuse; (2) defendant was under the influence of alcohol and drugs at the time of the offenses; (3) defendant had a chaotic and abusive childhood; and (4) defendant has a long standing substance abuse problem which may be caused by genetic factors and aggravated by head trauma. The trial court concluded, however, that the mitigating circumstances did not outweigh the aggravating circumstances and were not sufficiently substantial to call for leniency. As part of our independent review, we address each mitigating circumstance defendant alleged.

## 1. Statutory Mitigating Circumstance (G)(1)

The trial court considered the evidence presented regarding defendant's mental health and drug use but found he had not proved by a preponderance of the evidence that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was significantly impaired. *See* A.R.S. § 13–703(G)(1). Specifically, the trial court found that defendant's conduct during and after the murders, including lying to Russell Dechert so that Dechert would leave the Gumina residence, retrieving his belongings from a friend's house before leaving town, abandoning Katherine Gumina's car, and taking a taxi to Las Vegas, showed that defendant understood the wrongfulness of his acts and attempted to avoid prosecution. Moreover, the trial court noted that the expert testimony regarding defendant's drug use before the murders was based solely on defendant's self-reporting. We agree with the trial court that the evidence of defendant's drug use and related mental health problems supported the finding of a non-statutory mitigating circumstance, as dis-

cussed below, but not the (G)(1) circumstance.

## 2. Statutory Mitigating Circumstance (G)(2)

The trial court also found that defendant did not prove by a preponderance of the evidence that he was "under unusual and substantial duress." A.R.S. § 13–703(G)(2). The only evidence presented at trial to establish this circumstance and the participation of another person in the crimes was defendant's testimony that Frank Sperlazzo was involved with the murders, that Sperlazzo was angry with Robert Weaver because Robert owed him money for drugs, that Sperlazzo was at the Gumina residence on the night of the murders, and that Sperlazzo killed Tisha Weaver. Additionally, although he did not testify, Cordell Reid told the state's investigator that he saw Frank Sperlazzo near the Gumina residence on the day before and the night of the murders.

 This evidence is not sufficient to establish that Sperlazzo participated in the crime and that, as a result, defendant was under substantial duress. The state discredited Reid's story when it determined that Reid could not possibly have seen the Gumina residence from where he claimed to have been. Additionally, the physical evidence presented at trial showed that the three victims were attacked with the same type of blunt instrument, undermining defendant's claim that Sperlazzo killed Tisha Weaver. Therefore, we agree with the trial court that defendant has not established the (G)(2) mitigating circumstance by a preponderance of the evidence.

## 3. Victims' Family's Alleged "Indifference" to the Imposition of the Death Penalty

 Defendant asserts that the victims' family's "indifference" to the imposition of the death penalty should be given weight as a mitigating circumstance. The record does not support defendant's assertion. Although Jackie Weaver was quoted in a newspaper article as stating that she opposed the death penalty in this case, her reasoning was that the death penalty would be "too quick" for defendant. Moreover, Jackie later stated at the sentencing hearing that she did not oppose the death penalty in this case, and her sister stated that she hoped the death penalty would be imposed. *See State v. Williams,* 183 Ariz. 368, 385, 904 P.2d 437, 454 (1995) (victim's sister's recommendation of life sentence not relevant mitigating circumstance because recommendation was out of concern for defendant's family and was unrelated to defendant); *State v. Apelt,* 176 Ariz. 349, 368, 861 P.2d 634, 653 (1993), *cert. denied,* — U.S. ——, 115 S.Ct. 113, 130 L.Ed.2d 59 (1994) (request from victim's friend and sister that defendant not be sentenced to death not given mitigating weight). Thus, we do not give this circumstance mitigating weight.[3]

## 4. Chaotic and Abusive Childhood

 The trial court found that defendant's chaotic and abusive childhood was a mitigating circumstance. A difficult family background is not necessarily a mitigating circumstance unless defendant can show that something in his background had an effect on his behavior that was beyond his control. *See State v. Stokley,* 182 Ariz. 505, 524, 898 P.2d 454, 473 (1995), *cert. denied,* — U.S. ——, 116 S.Ct. 787, 133 L.Ed.2d 737 (1996). At the sentencing hearing, defendant's stepfather and the court-appointed expert testified that defendant suffered an abusive and chaotic childhood and that the abuse colored his behavior. Defendant's first stepfather was physically and verbally abusive to him, and defendant witnessed his mother being abused. In its special verdict, however, the trial court did not find any connection between defendant's family background and his conduct on the night of the murders, and our

---

**3.** Although defendant does not claim on appeal that the sentencing recommendations given by Jackie Weaver and her sister were improperly considered as aggravation evidence, we briefly address the issue. We have held that "the trial judge in a capital case is capable of focusing on the relevant sentencing factors and setting aside the irrelevant, inflammatory, and emotional factors." *State v. Williams,* 183 Ariz. at 386, 904 P.2d at 455. Nothing in the record indicates that the trial court gave any aggravating weight to the recommendations when he sentenced defendant; thus, we find no fundamental error.

review of the record does not reveal any such connection. Thus, we find that defendant's chaotic and abusive childhood is not a mitigating circumstance.

### 5. Potential for Rehabilitation

■ The trial court found that defendant did not prove his potential for rehabilitation as a mitigating circumstance. At the sentencing hearing, the court-appointed expert testified that although defendant successfully graduated from continuation school, he left a two-year drug rehabilitation program after 20 months and returned to drug use and was discharged for bad conduct from the Marines. We agree with the trial court that defendant has not established by a preponderance of the evidence that he can be rehabilitated in an institutional setting. *See Stokley*, 182 Ariz. at 524, 898 P.2d at 473.

### 6. Lack of Future Dangerousness if Confined to Prison

Defendant presented some evidence that he would no longer be dangerous if confined to prison for life, but we find that he failed to prove this by a preponderance of the evidence, particularly in light of the violent nature of his offenses. *See Stokley*, 182 Ariz. at 524, 898 P.2d at 473.

### 7. Participation of Another Individual

The trial court found that defendant did not establish by a preponderance of the evidence that another person participated in the crimes. We agree with the trial court's finding for the reasons set forth in our discussion of the (G)(2) statutory mitigating circumstance.

### 8. History of Substance Abuse and Intoxication at the Time of the Offenses

■ The trial court found that defendant had a long-standing substance abuse problem, which may be caused by genetic factors and aggravated by head trauma, and that he was under the influence of alcohol and drugs at the time of the offenses. Although defendant's impairment from voluntary intoxication does not rise to the level of statutory mitigation, we must still consider whether the impairment constitutes a nonstatutory mitigating circumstance, when viewed in light of defendant's alleged history of alcohol and drug abuse. *State v. Murray*, 184 Ariz. 9, 39, 906 P.2d 542, 572 (1995), citing *State v. Gallegos*, 178 Ariz. 1, 17, 870 P.2d 1097, 1113, cert. denied, —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994).

■ Defendant's history of substance abuse is well-documented. Defendant's stepfather testified at the sentencing hearing that by the time defendant was 17 years old, he had used many types of drugs and was an alcoholic and that defendant had attended two drug rehabilitation programs. In contrast, the evidence of defendant's intoxication on the night of the murders comes largely from defendant's self-reporting. At trial, defendant testified that he was under the influence of methamphetamines and alcohol on the night of the murders and that, at the time, he had not slept for 3 or 4 days. Russell Dechert, who saw defendant and Robert Weaver just before the murders, however, testified that, although he knew defendant had been drinking, he was not visibly intoxicated. We give some mitigating weight to this circumstance but find that it is not sufficiently substantial to call for leniency.

### 9. Head Injuries

The trial court gave some mitigating weight to defendant's head injuries in that it found that the head injuries may have aggravated defendant's substance abuse problem. We have held that "[h]ead injuries that lead to behavioral disorders may be considered a mitigating circumstance." *Stokley*, 182 Ariz. at 521, 898 P.2d at 470.

■ At the sentencing hearing, defendant's stepfather testified that defendant experienced "black outs" when he was 4 years old due to a calcium deficiency, that he sustained head injuries when he fell from roofs at ages 13 and 15, and that he was the victim of an assault while enlisted in the Marines. Additionally, Jack Potts, M.D., who prepared defendant's rule 26.5 mental health evaluation, testified that defendant's head injuries should constitute a mitigating factor because

they may have caused defendant to act more aggressively on the night of the murders. We agree with the trial court that the head trauma that defendant suffered as a child is a mitigating circumstance, but we also agree with the trial court's conclusion that this mitigation is not sufficient to call for leniency.

■ In connection with this issue, defendant argues that the trial court should have continued the sentencing hearing so that Dr. Potts could conduct further testing to determine the extent of defendant's head injuries. The decision whether to grant a continuance is within the trial court's discretion, and the trial court may deny a continuance where the defendant seeks to introduce evidence already before the court. *State v. Ohta,* 114 Ariz. 489, 491–92, 562 P.2d 369, 371–72 (1977).

■ Before the sentencing hearing, Dr. Potts examined defendant twice. Dr. Potts, however, testified at the sentencing hearing that he did not learn of the black outs defendant experienced when he was 4 years old or of the head injury that defendant sustained when he was 15 years old until defendant's stepfather testified at the aggravation/mitigation hearing. Although Dr. Potts testified that additional neurological testing would be helpful to determine the extent and impact of defendant's head injuries and to determine whether defendant suffers from an organic neurological disorder, he also testified that the new information would not substantially change his opinion. Because the additional testing in all likelihood merely would have corroborated Dr. Potts' testimony, we conclude that the trial court acted within its discretion when it declined to grant a continuance. *But cf. State v. Eastlack,* 180 Ariz. 243, 263–65, 883 P.2d 999, 1019–21 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1978, 131 L.Ed.2d 866 (1995) (case remanded for resentencing because defendant had not received any psychological evaluation).

**10. Mental Illness**

■ Defendant presented some evidence at the sentencing hearing that he may suffer from cyclothymia, a form of mental illness. Defendant did not, however, establish a caus-

al connection between his alleged mental illness and his conduct on the night of the murders, nor did he provide any documented instances of his alleged illness. Thus, defendant has not established mental illness by a preponderance of the evidence, and we do not give it mitigating weight. *See State v. Stuard,* 176 Ariz. 589, 608 n. 12, 863 P.2d 881, 900 n. 12 (1993) ("[E]vidence of causation is required before mental impairment can be considered a significant mitigating factor."). *Cf. Stokley,* 182 Ariz. at 524, 898 P.2d at 473 (nonstatutory mitigating weight given where defendant had documented mental disorders).

**11. Remorse**

We agree with the trial court's finding that defendant failed to prove remorse by a preponderance of the evidence. *See Stokley,* 182 Ariz. at 525, 898 P.2d at 474. Although Dr. Potts testified that defendant was genuinely remorseful about murdering Robert Weaver and attempting to murder Katherine Gumina, he has not accepted responsibility for Tisha Weaver's death.

**C. Independent Review**

■ Defendant argues that the trial court improperly weighed the aggravating and mitigating circumstances. In death penalty cases, this court independently reviews any aggravating and mitigating circumstances to determine whether the death penalty was properly imposed. *State v. Gulbrandson,* 184 Ariz. 46, 67, 906 P.2d 579, 600 (1995); A.R.S. § 13–703.01. Accordingly, we have reviewed the entire record, considering and independently weighing all of the aggravating and mitigating evidence presented. *Gulbrandson,* 184 Ariz. at 67, 906 P.2d at 600, citing *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797, *cert. denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).

■ Regarding Robert Weaver's murder, we find the following aggravating circumstances: (1) defendant committed the murder for pecuniary gain; (2) the murder was especially cruel, heinous, or depraved; and (3) defendant was convicted of another homicide that he committed during the commission of

the instant offense. Regarding Tisha Weaver's murder, we find the following aggravating circumstances: (1) defendant committed the murder for pecuniary gain; (2) the murder was especially cruel, heinous, or depraved; (3) defendant was convicted of another homicide that he committed during the commission of the instant offense; and (4) the victim was under 15 years of age. Regarding both murders, we give mitigating weight to defendant's history of substance abuse, intoxication at the time of the offenses, and head injuries, but we find that the mitigating circumstances are insufficiently substantial to call for leniency.

### *Disposition*

We have independently reviewed the record for fundamental error and have found none. *See State v. Kemp,* 185 Ariz. 52, 67 & n. 1, 912 P.2d 1281, 1296 & n. 1 (1996). Accordingly, we affirm defendant's convictions and sentences.

FELDMAN, C.J., ZLAKET, V.C.J., and MOELLER and MARTONE, JJ., concur.